**Statement of Facts of Ruth Berenstein in Support of Personal Bankruptcy Filing**

**United States Bankruptcy Court**

**Eastern District of New York**

**In re:**

**Ruth Berenstein,**

**Debtor**

**Chapter:**

**Case No.:**

---

## STATEMENT OF FACTS OF RUTH BERENSTEIN IN SUPPORT OF PERSONAL

## BANKRUPTCY FILING

### RE: AccessHeat Inc

1. In March 2022, Adam Ezell, a broker of Sunbelt Advisors, approached Ruth Berenstein from AccessHeat Inc regarding the sale of a business.

2. After several months of document review and due diligence, a transaction was completed on June 9th, 2022.

3. On the day of the closing, Mr. Jack Harrison, the chairman of AccessHeat Inc, Ms. Ruth Berenstein, and An unarmed driver attended the closing site at Protech Metals LLC in Pinehurst, North Carolina.

5. William Rickey Hall introduced Ms. Berenstein and Mr. Harrison to all the employees and

Local First Bank where the bill of sale was signed.

6. Ms. Berenstein observed numerous alcoholic beverages in William Rickey Hall's fridge at the work site, raising concerns.

7. William Rickey Hall was not intoxicated on the day of the closing, but post-closing, all parties went to lunch and consumed alcohol apart from Ms. Berenstein and Mr. Harrison.

8. The entire 6-hour meeting proceeded without any hostility, coercion, or force.

9. William Rickey Hall consulted with his counsel once more before signing the final papers on the day of closing.

10. The 2022 Tax Returns presented during due diligence confirmed William Rickey Hall as the sole owner of Protech Metals LLC. Myra Hall was never mentioned during the due diligence process.

11. Sunbelt Brokers of North Carolina, who represented William Rickey Hall, also confirmed that he was the sole owner of Protech Metals and never mentioned any other stakeholders in Protech Metals LLC.

12. Post-closing, for two weeks, Ms. Berenstein requested various operational documents from Mr. Hall.

13. Mr. Hall consistently delayed and did not provide the requested documents/information to Ms. Berenstein.

14. On June 14th, Ms. Berenstein identified a fund transfer from the business account to Mr. Hall's personal account. When confronted, Mr. Hall denied any such movement. It's important to note that only Mr. Hall and Ms. Berenstein had admin rights to the account.

15. Subsequently, Ms. Berenstein revoked Mr. Hall's admin rights to the account and deactivated the card to further investigate potential embezzlement.

16. On June 19th, 2022, Ms. Berenstein traveled from New Jersey to Pinehurst to address the transition delays with Rick.

17. Ms. Berenstein received an irate call from Rick, filled with profanity, expressing his displeasure over the revocation of his bank account admin rights.

18. Given the physical disparity between Ms. Berenstein and Mr. Hall, and Mr. Hall's known affinity for alcohol, firearms and over all hostility, Ms. Berenstein sought local security for her safety during her visit on June 21st.

19. Ms. Berenstein, without any intention of intimidation, was met with extreme agitation from Mr. Hall on June 21st. He loudly demanded that she and her security detail leave the premises, citing a fear of weapons. The security team offered to leave their weapons in their vehicle.

20. With multiple witnesses present, Ms. Berenstein calmly explained to Mr. Hall that he would be on paid leave until he chose to return and cooperate with AccessHeat for a smooth transition.

21. Mr. Hall, after agreeing to the terms, departed the premises. The sheriff present at the time advised him not to return until the ongoing dispute was resolved.

22. On or around June 24th, Mr. Hall returned to converse with Ms. Berenstein. He expressed his displeasure about selling the business to a young female, making derogatory remarks about her capability to manage a manufacturing or distribution business.

23. Ms. Berenstein had suspicions regarding the legal status of some Protech Metals LLC employees. When she voiced these concerns, Mr. Hall reacted aggressively, suggesting that not everything should be done "by the book."

24. Subsequent investigations revealed, with evidence, that Rick Hall and Brian Brewer were aware of the illegal employment status of Candelario and Guadalupe, who had been with Protech Metals LLC for over 20 years.

25. Ms. Berenstein discovered that since 2020, there were significant issues with the paint quality and service for the major contract with Ingersoll Rand. The severity of the issue led the Operations Associate to seek advice from Caterpillar, bypassing Ingersoll Rand.

26. Conversations with Brian Brewer, a longtime friend of Rick Hall and Operations Manager for over 15 years, revealed that he had been making under-the-table payments to Luis Garcia at Ingersoll Rand to maintain the contract to which Ms. Berenstein denied its continuance. This contract was worth 75% of Protech Metal's revenue.

27. Throughout June and July, Rick persistently contacted the employees, claiming he had been deceived and intended to reclaim ownership from Ms. Berenstein.

28. Brian Brewer conveyed to Ms. Berenstein about Mr. Hall's borderline criminal behavior through multiple text messages. He expressed his frustrations and fears of extortion.

29. Brian Brewer also indicated that Mr. Hall played no significant role in Protech Metals LLC and was not welcome at the client site (Ingersoll Rand), which accounted for approximately 80% of the company's revenue.

30. Around July 11th, Brian Brewer initiated a 50-c against Rick Hall due to Rick's continuous disruptions when Ms. Berenstein was off-site.

31. Shortly after, Brian Brewer retracted his 50-c and resigned from Protech Metals.

32. Ms. Berenstein had also filed a 50-c but was counseled by a counsel from Womble Dickinson to withdraw it on July 25th to address the dispute more amicably.

33. On July 26th, Mr. Hall filed a Restraining Order against Ms. Berenstein, making several unfounded allegations against her and AccessHeat Inc. These motions were dismissed on July 28th in Moore County court, charges were then dropped.

34. Around July 8th, Mr. Hall's son and Ms. Berenstein collaborated with a junk removal team to

clear unnecessary trash on-site and label Mr. Hall's personal items. Most of these items were removed by Mr. Hall, who visited multiple times to verify.

35. Mr. Hall repeatedly returned to the site without notice, threatening and harassing Ms. Berenstein in front of several witnesses. On August 5th, the Sheriff warned him again after he attempted to remove property from the site.

36. On October 5th, Mr. Hall returned, stealing a computer from the business and fleeing before the arrival of the Sheriffs.

37. All lease payments were consistently made to Mr. Hall via check every month since the acquisition.

38. Mr. Hall refrained from cashing any payout or lease checks until mid-November, a historically low production month. This was also when Ingersoll Rand, contributing to 80% of Protech Metals LLC's revenue, terminated their agreement.

39. Following these events, Mr. Hall's associates escalated their threats. Notably, on December 10th, Keith Anderson sent a menacing text message to Ms. Berenstein, threatening severe harm and gang rape.

40. On December 1st, Brian Brewer sent a message to Ms. Berenstein. Within this message, he included a screenshot of her security camera, proceeding to disrespect her through the text.

41. Due to the escalating harassment and threats, Ms. Berenstein felt compelled to report all three men, namely Mr. Hall, Mr. Brewer, and Mr. Anderson, to the magistrate. Subsequent to her report, individuals were apprehended and assigned court dates.

42. On January 10th, following his arrest, Rick Hall made an attempt to contact Ms. Berenstein. She chose not to engage and did not answer his call.

43. In what appears to be a tactic to intimidate Ms. Berenstein, Mr. Hall reported a worthless

check crime to the magistrate. This pertained to checks amounting to over $30,000, which he attempted to cash during a historically low production month for the business.

44. In March, upon being informed of an impending OSHA inspection concerning asbestos, Mr. Hall took the opportunity to halt operations during a period when Ms. Berenstein was away on business travel. Furthermore, he took unauthorized action to change the locks on the building and stole the new client base data with the assistance of the former admin Donna Groff.

45. Given Mr. Hall's unpredictable and concerning behavior, coupled with allegations of fraud and misrepresentation, AccessHeat Inc. resolved to initiate legal proceedings in April. Predictably, Mr. Hall filed for bankruptcy soon after, a move that many legal counsels had anticipated.

46. With the assistance of Mr. Waldrep and Mr. Van Camp's firm, AccessHeat Inc. was able to draft a final settlement agreement between Rick Hall, Myra Hall, Protech Metals, and Ruth Berenstein. Within this agreement, Mr. Hall consented to pay a settlement amount, ensuring he would not face legal repercussions for his alleged fraudulent and criminal actions. Both parties affixed their signatures to this agreement.

47. From July 2022 to April 2023, Ms. Berenstein made multiple attempts to find a resolution to the ongoing disputes. She engaged the services of several law firms during this period. However, it became increasingly clear that Mr. Hall was not genuinely interested in finding a resolution, but rather seemed intent on prolonging the process.

48. Throughout the ten-month period of AccessHeat's legal ownership, Ms. Berenstein continued to remunerate Mr. Hall with a salary. Despite this, he repeatedly returned to the site, where he engaged in actions that can be described as harassment and threats directed at Ms. Berenstein.

49. From the moment of acquisition until the forceful eviction orchestrated by Mr. Hall, Ms. Berenstein and AccessHeat Inc. worked diligently. Their efforts were focused on securing

additional contracts and establishing new client relationships.

50. Protech Metals LLC was presented to potential buyers as a business boasting nearly $1 million in revenue. However, it was later revealed that a significant 80% of this revenue was rooted in close personal friendships and a myriad of undisclosed production issues.

51. A closer examination of the financials revealed that, when discounting the problematic contract, Protech Metals LLC's actual revenue ranged between $150,000 to $200,000.

52. Ms. Berenstein engaged with multiple paint vendors across the nation in a bid to find a viable solution for Ingersoll Rand. However, she was kept out of the loop regarding the core issues. Instead, these issues were communicated to Harmony McDowell, a close associate of Mr. Hall with a history of drug addiction.

53. Recognizing the need for a legitimate workforce, Ms. Berenstein made concerted efforts to recruit new staff, replacing the illegal workers previously employed by Rick Hall. Legal counsel (Womble Dickinson) advised her to terminate these workers immediately, given the potential legal repercussions.

54. Ms. Berenstein worked tirelessly to secure new contracts, aiming to revitalize the business after the unexpected drop in revenue. Within two months of taking over the business, she secured a contract worth over $100,000 with a reputable vendor, Danao Living, based in North Carolina. This contract was the lifeline for Protech Metals LLC. Furthermore, Ms. Berenstein had

established connections with prominent construction companies in the region, such as Crowne Partners, RDU Airport, Ocano Club (a project worth man than $500k) and Dr. Horton (the largest home builder in the country). She also generated over 500 leads for Protech Metals, dedicating hundreds of hours to manual outreach efforts.

55. Friends and associates of Mr. Hall took to online platforms to leave negative reviews about Protech Metals LLC, specifically targeting the new management. These individuals, despite never having visited Protech Metals LLC, made disparaging remarks about the "bad people" who had taken over as the new owners.

56. Ms. Berenstein was informed by former business partners of Mr. Hall that he was actively engaging in efforts to tarnish her professional reputation.

57. In a particularly concerning incident, Mr. Hall, in collaboration with Donna Groff and an employee of Ms. Berenstein, created a fraudulent "Wanted" poster using Ms. Berenstein's image. This poster was then distributed across all businesses owned by Ms. Berenstein. This act not only instilled fear but also severely damaged her existing business relationships.

58. The actions of Mr. Hall, particularly his reckless behavior, jeopardized the well-being of many patients. Additionally, his actions caused numerous employee-related issues for Ms. Berenstein within GeneralHealth Group Inc, causing damages.

59. As a result from the disbursement of these fraudulent fake wanted posters and blog from "health watch" alleging that Ms. Berenstein was wanted by the FBI, operating a ponzi scheme, along with using Ms. Berensteins former partners record against her and her business operations causing her to lose ~$8M in yearly revenue.

60. Leading to her business located in UT, OH, SC, IL and TX into recession, placing patients lives at risk, and causing multiple employees to lose their jobs.

61. Furthermore leading to GENERALHEALTH GROUP INC. (GHG) to be sued using these defamatory and fraudulent allegations

**RE: GeneralHealth Group Inc**

## RE: Dr Aylward's Practice

62. On May 5, 2021 GeneralHealth Group (Adon Segal former CEO) made and approached Gerrard Aylward and Linda Aylward in its interest in purchasing its dental practice (ChicagoLand4Braces)

63. APA came to its execution on October 13, 2021, under the assumption that accounts payables (AP) was to be cleared off and $60,000 in accounts receivables (AR) to be collected, when in reality the practice was under over $100,000 in debt

64. Gerrard Aylward had received .25% of share to which later was increased to 20% of shares upon his continued support for GENERALHEALTH GROUP INC. (GHG) in further expanding its business

65. On Jan 29, 2022 Linda Aylward attempted to mislead GENERALHEALTH GROUP INC. (GHG) into assuming an SBA loan under the assumption that funds were spent on the business expenditure. Based on factual evidence and the lack of paper trail clarifying what was used for the business, GENERALHEALTH GROUP INC. (GHG) concluded that majority of the SBA loan was in fact used to repair Gerrard Aylwards home roof rather than the business hence GENERALHEALTH GROUP INC. (GHG) did not assume that liability,

66. On June 11, 2022 Linda Aylward was confronted for stealing over $13,000 of GENERALHEALTH GROUP INC. (GHG)s revenue to which she Zelled over to the GENERALHEALTH GROUP INC. (GHG) bank account after numerous conversation and her

denying ever having the funds

67. Out of good faith GENERALHEALTH GROUP INC. (GHG) continued with the business operations & paying off the vendorswhile excluding the $100,000 of debt from the purchase. This debt and misleading transaction contributed to much of the financial strain that came onto GENERALHEALTH GROUP INC. (GHG) in the later months.

**68.** Over its continuance of business GENERALHEALTH GROUP INC. (GHG) had increased the businesses, recruited professionals,improved the overall marketing.

69. Upon Gerard Aylward and Linda Aylward discovering that GENERALHEALTH GROUP INC. (GHG) was having liquidity issues they decided topursue litigation with fraudulent  and defamatory allegations

70. Gerrard Aylward and Linda Aylward later on decided to pursue litigation against GENERALHEALTH GROUP INC. (GHG) claiming the GENERALHEALTH GROUP INC. (GHG) owed them the initial $100,000 of debt they had handed over the business with. Fraudulently claiming that GENERALHEALTH GROUP INC. (GHG) had placed the practice under that debt.

71. Gerrard Aylward fraudulently claimed that GENERALHEALTH GROUP INC. (GHG) had "mislead" him into believing that he would be obtaining shares within the corporation, and alleged that no payments were ever madeand fraudulently filed these allegations in court.

72. Gerrard Aylward took it upon himself to call another doctor by the name of Dr. David Kozal, which had also sold his business to GENERALHEALTH GROUP INC. (GHG) and spread not only rumors but also fraudulent and defamatory allegations about Ms. Berenstein and GeneralHealth Group as a whole.

73. GENERALHEALTH GROUP INC. (GHG) proved these allegations to be nothing but an attempt to sabotage GENERALHEALTH GROUP INC. (GHG)s reputation along with Ms.

Berenstein's. Upon factually proving these allegations to be fraudulent during discovery, on November 3, 2023, Gerrard Aylward along with Linda Aylward and Ms. Berenstein entered into a settlement agreement to which was later executed and finalized on April 3, 2024.

## RE: Dr. Michel/Michael Neret's Practice

74. On September 14th, 2022 Dr. Neret responded to an email sent by Mark Cohen, a volunteer operations contractor, regarding GENERALHEALTH GROUP INC. (GHG) interest in the acquisition of his practice.

75. From September 14th, 2022, to the 1st of February, 2023, GENERALHEALTH GROUP INC. (GHG) and Michel Neret engaged in discussionsregarding the sale, including detailed financial reviews, leading to the signing of the asset purchase agreement (APA) agreement. Both parties agreed that ancillary documents would be signed during the transition.

76. Over the course of 4 and a half months, Dr. Neret had extensive discussions with GENERALHEALTH GROUP INC. (GHG) about financialsand the intricacies of post-acquisition procedures.

77. During the same period, GENERALHEALTH GROUP INC. (GHG) facilitated a smooth transition for the sale of real estate from one of Dr. Neret's properties to a buyer, ensuring a trustworthy transition and client reassurance.

78. After signing the asset purchase agreement (APA), the transition commenced, and GENERALHEALTH GROUP INC. (GHG) and Dr. Neret were scheduled to meet in early April of 2023.

79. During the two months following the signing of the asset purchase agreement (APA), GENERALHEALTH GROUP INC. (GHG) became aware of Dr. Neret's expulsion from an Optum program due to questionable coding tactics, as informed by the officemanager of Dr. Neret's

previous practice.

80. GENERALHEALTH GROUP INC. (GHG)'s billing contractor advised GENERALHEALTH GROUP INC. (GHG) of Dr. Neret's unethical coding behavior

81. During this period, GENERALHEALTH GROUP INC. (GHG) diligently worked to rectify billing matters to prevent financial strain on Dr. Neret'spractice, ensuring it did not suffer as a result of the coding issues. It's worth noting that Dr Neret was desperately putting in personal funds from account 99339 into the practice prior to the acquisition and this can be seen on the IBC business bank statement as well.

82. On April 11th, Dr. James Bonnette (GENERALHEALTH GROUP INC. (GHG)s now former Chairman) and Ms. Berenstein confronted Dr. Neret at his office for his fraudulent coding tactics, leading to a denial initially. Subsequently, when presented with lettersfrom Wellmed, Dr. Neret's demeanor changed, reflecting discomfort and anger.

83. On April 14th, Dr. Bonnette expressed serious concerns to Ms. Berenstein about Dr. Neret's practice based on his discussions with GENERALHEALTH GROUP INC. (GHG)'s billing contractor.

84. On April 17th, Dr. Bonnette resigned due to severe concerns regarding the entirety of Texas practices being conducted through fraudulent coding and supported GENERALHEALTH GROUP INC. (GHG) in referring them to a firm that can assist with a billing audit. It's worthy to note that Dr Bonnette is one of the most respected VPs of the largest healthcare company in the U.S., Optum (UnitedHealthCare)

85. From April 17th to April 20th, Mark Cohen visited Dr. Neret's practice to analyze certain mattersand create an action plan for growth. Mark Cohen reported that he observed discomfort in Dr. Neret's behavior whenquestioned about unethical coding practices.

86. Less than three weeks later, Dr. Neret locked GENERALHEALTH GROUP INC.

(GHG) and its representatives out of all bank accounts, refusing to discuss the matter and displaying an uncooperative attitude.

87. Noah Meek, a counsel of Dr. Neret contacted GENERALHEALTH GROUP INC. (GHG) with misleading words and claims, and GENERALHEALTH GROUP INC. (GHG) insisted on payment for their invoice and work, or else they would not proceed with a rescission.

88. Noah Meek decided to file a lawsuit against GENERALHEALTH GROUP INC. (GHG) and Ms. Berenstein with fraudulent claims, including baselessaccusations of GENERALHEALTH GROUP INC. (GHG) directors and freelancers being "fugitives."

89. Noah attempted to use two irrelevant lawsuits, where Ms. Berenstein prevailed, as a tactic to intimidate counsels, despite the lack of relevance to the current case. One of the lawsuits relates to a fraudster who Ms Berenstein sued and received a settlement fee from, Rick Hall. The other is a lawsuit made with malice intent towards GENERALHEALTH GROUP INC. (GHG) by Gerard Aylward.

90. Dr. Neret, in the Temporary Restraining Order (TRO), explicitly requested that GENERALHEALTH GROUP INC. (GHG) or any of its representatives refrain from contacting any payers, with special emphasis on UnitedHealth, the group that had previously expelled him due to fraudulent behavior.

**RE: Paul Hammer. Barron and Newburger P.C.**

91. Paul Hammer a Shareholder from Barron and Newburger, P.C. approached GENERALHEALTH GROUP INC. (GHG) on June 23rd earlier this year (2023) and requested to discuss a potential assistance for the allegationsagainst GeneralHealth Group Inc and its subsidiary.

92. Ms. Berenstein and Paul had a 19 minute discussion on 26th of June where they spoke about

the case and about how they will be representing GENERALHEALTH GROUP INC. (GHG) Inc, with the exception of Mark/Morty due to the taboo associated with his personal case. Ms. Berenstein agreed to this and executed theengagement letter.

93. On the 28th of June, all the evidence was compiled against the fraudster Dr Neret and the facts of his unethical and fraudulent activities.

94. Ms. Berenstein reached out several times until receiving a response about a "reaching out" to the opposing counsel regarding regaining the business bank account access which Ms. Berenstein clarified on the phone call with Paul that GENERALHEALTH GROUP INC. (GHG) nor any of its representatives had any access to.

95. a. On the 6th of July, our group received an incorrect invoice from Barron and Newburger, PC reflecting incorrect hours. 2 hours were charged for a 19-minute phone call along with other skeptical charges.

95. b. On July 17th, Ms. Berenstein had a short call less than 15 minutes with Charles who explained that there has been one phone call with the opposing counsel in which he was yelling the whole time and not listening to anyone and that he will let Ms. Berenstein know if there is any responses moving forward.

96. On August 11th, Ms. Berenstein sent another simple email with full details to the questions asked by Charles. These questions were all answered on the phone call as well as the initial email of evidence sent on June 28th , 2023.

97. On August 11th, 2023,  Ms. Berenstein also asked about the excessive and unjustified number of hours spent on this case which was up to 32 hours up to that point with absolutely no explanationof what had occurred. Ms. Berenstein also sent a doc file requested by the GENERALHEALTH GROUP INC. (GHG) team to give fullmeeting notes and explanations of these "meetings of countless hours" with the opposing counselto which of only 1-2 of them

GENERALHEALTH GROUP INC. (GHG) was made aware of but received absolutely no response.

98. On October 19th , 2023, (after telling Ms. Berenstein on September 9th, 2023, that Paul will get back to Ms. Berenstein as soon as possible regarding the invoices) Paul sent one email explaining a settlement offer that has no benefits for GENERALHEALTH GROUP INC. (GHG), has misleading verbiage and to which the opposing party had not agreed to.

99. On November 21, 2023 Paul Hammer sent a withdrawal motion 8 business days prior to the trial uponbeing questioned as to why we were receiving doctored email along with fraudulent claims made on the invoice.

100. Failing to disclose any discovery questions from opposing parties, along with the failure to pay the jury trial fess, and the failure to file a motion to grant clients the opportunity to obtain time in order to retain a new legal counsel, lead to a default judgement

101. In the post judgement discovery, many irrelevant information was demanded to be provided by Noah Meek.

102. Under the current pressure from the opposing party, Ms. Berenstein was demanded to provide personal employee information although our greatest efforts not to do so. As it was stated that it would put the corporation in its entirety at risk.

103. Upon disclosure of GENERALHEALTH GROUP INC. (GHG)s bank accounts and information, a mysterious email from "Healthcarewatch@gmail.com" was sent out as an email campaign, claiming that GENERALHEALTH GROUP INC. (GHG) and Ms. Berenstein were conducting fraudulent activities and were partaking in a Ponzi scheme, along with further allegations of Ms Berenstein being wanted by the FBI. This was a deliberate act of sabotage orchestrated with malicious intent.

103SUPP. It is important to note that following the termination of all contracts with

GENERALHEALTH GROUP INC. (GHG) due to the dissemination of defamatory emails

falsely accusing Ms. Berenstein of operating a Ponzi scheme, Mr. Noah Meek resorted to threats

of incarceration in an effort to coerce unjust and unfair payments. Mr. Meek's intimidation

tactics included demands that GENERALHEALTH GROUP INC. (GHG) refrain from paying

its vendors or employees, and instead prioritize the payment of Mr. Michel Neret's default

judgment.

### RE: Dr. Magid's Practice

104. GENERALHEALTH GROUP INC. (GHG)s initial outreach was made on November 29th,
    2022 to Dr Magid.

105. A serious of due diligence questions were sent to Dr Magid(Answers to DD doc file)

to which one answer in particular specified that he is in fact the sole owner of the LLC

and real estate.

106. June 30th, 2023, both parties finalized the closing documents

107. The office manager amongst other staff made many complaints dating back to January

30th, 2024, about problematic staff with little to no action taken on behalf of Dr. Magid to help

mediate the problems due to his favoritism towards older staff

108. Our 7-month progress report that GENERALHEALTH GROUP INC. (GHG) has worked

relentlessly highlights the positiveimpact GENERALHEALTH GROUP INC. (GHG) brought

to Dr. Magids practice.

109. On Feb 21st, 2024 we received a subpoena order from Deborah Magid (ex wife of Dr. Magid)

110. Dr. Magids' attorney Justin Wade and Ruth had a discussion regarding the fraudulent

allegations in Illinois and the default judgment in Texas.

111. On March 8th, 2024 Airbnb records show that Ms. Berenstein traveled to meet with Dr. Magid in person to discuss and address the concerns raised by Dr. Magid and Justin.

112. Upon Ms. Berenstein arrival and discussion with Dr. Magid, it appeared that Ms. Bernstein's suspicions were correct as per Dr. Magid confirmed that in fact Deborah owned 50% of the PC and was intitled to 50% of the payouts and the lease, he just believed that she was not entitled to it.

113. Dr. Magid went on to completely ignore Ms. Berenstein while GENERALHEALTH GROUP INC. (GHG) remained locked out of the business bank account and attempting to mediate the problem

114. Dr. Magid only emailed Ms. Berenstein on the day of her arrival in Lynchburg, essentially pleading with her once again not to disclose documents to his wife's counsel, as he was attempting to hide the transactional documents from her. (March 8th)

115. On March 8th, Dr. Magid also shared an email drafted by Deborah divorce attorney showing an email from "healthwatch.com" making fraudulent and defamatory allegations about Ms. Berenstein and a former contractor along with the default judgement made in Texas

116. In Ms. Berenstein last email to Justin Wade dated March 14th, 2024 I highlighted my concerns over Dr. Magids speculative actions,  confirmation of Deborahs 50% ownership and along with a notice of breach of contract. Out of good faith Ms. Berenstein requested further time in attempting to mediate all problems prior to heading into potential litigation.

117. Dr. Magid then proceeded to stop an IT vendor transition intentionally

118.  Dr Magid's divorce counsel, Joseph Sanzone then reached out to GENERALHEALTH GROUP INC. (GHG)s internal legal advisor Mr. Stein becausethey were concerned that GENERALHEALTH GROUP INC. (GHG) would provide the transactional documents to Dr.

Magids former wife.

119. Joseph Sanzone provided the name of a divorce counsel and recommended that GeneralHealth Group (GENERALHEALTH GROUP INC. (GHG)) retain his services to avoid the obligation of responding to the subpoena order that had been received.

120. Ms. Berenstein and her team attempted to retain ownership of their bank account with Truist Bank to ensure access, based on their rightful assumption agreement and bill of sale. Truist Bank confirmed that Dr. Magid was locking GENERALHEALTH GROUP INC. (GHG) out of the business account. At this time, the revenue and accounts were solely owned by GENERALHEALTH GROUP INC. (GHG).

## RE: Dr Choby's Practice

121. The Center for Dental Implants was acquired on July 1, 2023

122. Prior to GENERALHEALTH GROUP INC. (GHG)s takeover Dr. Bill Choby the former owner of The Center for Dental Implants would transfer personal funds to keep the business alive

123. Throughout the management of GENERALHEALTH GROUP INC. (GHG), Dr. Choby was very resistant and reluctant to change

124. There were numerous disputes over calculations, vendor costs, recruitments made and overall, any improvements made toward the practice

125. GENERALHEALTH GROUP INC. (GHG) managed to increase payer rates by 30%

126. GENERALHEALTH GROUP INC. (GHG) managed to save Dr. Choby from the verge of both personal and corporate bankruptcy due to the increases in rates allowing the practice to sustain itself.

127. GENERALHEALTH GROUP INC. (GHG) also successfully reduced vendor costs

while increasing the quality of products

128. Upon receiving a mysterious email from healthwatch@gmail.com Dr. Choby took it upon

himself to restrict GENERALHEALTH GROUP INC. (GHG) out of their bank account access

129.    Dr. Choby went on to allege that GENERALHEALTH GROUP INC. (GHG) owed

him $30,000 when the practice generated $15,000-20,000 in monthly revenue. This

allegation seems to be a tactic aimed at reclaiming the practice from GENERALHEALTH

GROUP INC. (GHG) without compensating for the improvements made. The nature of this

allegation suggests it may be a strategic maneuver, similar to other unscrupulous tactics

previously encountered by GENERALHEALTH GROUP INC. (GHG).

130. These defamatory and fraudulent allegations against GENERALHEALTH GROUP INC.

(GHG) and Ms. Berenstein caused the loss of nearly all its revenue leading to it filing with the

courts for Chapter 7 at both the corporation and individual.

131. In reviewing the situation, it is important to note that Mr. Hall previously indicated that he

had ceased operations under Protech Metals LLC. However, it has come to light that he is

continuing to conduct business under the name Pinehurst Blacksmith Shop. This was

confirmed through a phone call to Protech Metals, during which Mr. Hall answered the phone

and identified the business as Pinehurst Blacksmith Shop. Additionally, original Google

reviews reveal the unfortunate decline in the business's performance following Mr. Hall's

resumption of control. This appears to be a key reason behind his decision to operate under a

different name, potentially to avoid negative associations with the previous entity.

**Affidavit of Ruth Berenstein in Support of Personal Bankruptcy Filing**

United States Bankruptcy Court

Southern District of New York

In re:

Ruth Berenstein,

Debtor

Chapter:

Case No.:

## AFFIDAVIT OF RUTH BERENSTEIN IN SUPPORT OF PERSONAL BANKRUPTCY FILING

I, Ruth Berenstein, being duly sworn, depose and say:

### 1. Introduction and Background

My name is Ruth Berenstein, and I am the Managing Director of AccessHeat Inc. and GeneralHealth Group Inc. I am submitting this affidavit in support of my personal bankruptcy filing under Chapter ___ of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

### 2. Reason for Bankruptcy Filing

The purpose of this filing is to address the financial devastation caused by the fraudulent actions of three individuals: Mr. Rick Hall, Mr. Gerrard Aylward, Mr. Michel Neret, Mr. Mitchell Magid, and Ms. Deborah Magid. These individuals, through a series of deceptive practices, have

not only undermined my businesses but have also subjected me to extensive legal fees that have significantly strained my personal finances.

### 3. Details of Fraudulent Activities

The specific details of my interactions with Mr. Hall, Mr. Aylward, and Mr. Neret are meticulously documented in the attached "Statement of Facts," which forms an integral part of this affidavit. This document outlines the events that led to my current financial situation, including the fraudulent tactics employed by these individuals to siphon resources from my businesses and the resulting legal battles that ensued. The exhibits have been uploaded and are numbered in accordance with each statement of facts; for instance, Exhibit 1 corresponds to the first factual assertion in the Statement of Facts document providing supporting documentation for the claims made. Please note that there are hundreds of additional pages of exhibits available, which I can provide upon request from the honorable judge or the respected trustee at any time.

### 4. Financial Impact

My family, friends, and I have collectively invested over $400,000 into launching and sustaining my businesses, AccessHeat Inc. and GeneralHealth Group Inc. These ventures were intended to contribute positively to the economy and to provide livelihoods for many employees. However, due to the fraudulent actions of the aforementioned individuals, I have suffered severe financial losses that have left me no choice but to seek relief through this bankruptcy filing.

### 5. Intention Behind Filing

I wish to make it clear that this bankruptcy filing is not an attempt to evade my obligations. Rather, it is a necessary step to protect my remaining assets and to bring to light the fraudulent conduct of those responsible for my financial distress. My objective is to ensure that the truth is

revealed and that justice is served, allowing me to eventually rebuild my financial standing and continue to contribute to society.

## 6. Caution Regarding Misleading Claims

Considering the ongoing legal disputes and the various misleading claims that have been made against me by Mr. Neret's counsel Mr. Noah Meek and other counsels of Mr. Aylward, and Mr. Hall, I respectfully urge the Court and the Trustee to scrutinize any future communications or filings from these parties carefully. Mr. Meek has employed several disingenuous tactics aimed at harming my reputation:

- **Personal Allegations:** Mr. Meek has referenced false accusations made against my ex-husband, which he has been fighting for the past five years. These allegations have no relevance to my business conduct and are being used unfairly to tarnish my reputation.

- **Name Change Misrepresentation**: He has also attempted to cast doubt on my integrity by highlighting my marital name change, implying that it was done to deceive others. This claim is baseless and ignores the legitimate personal reasons behind the change.

- **Misleading Bankruptcy Report**: Lastly, Mr. Meek has mischaracterized a bankruptcy report related to Protech Metals, a business whose former owner at the time defrauded me and subsequently paid a settlement to avoid legal action. Mr. Meek continuously uses this report to unjustly tarnish my reputation.

Given these tactics, I urge that any claims or submissions from Mr. Meek be evaluated with caution, ensuring that the proceedings remain focused on substantiated evidence and not on unfounded allegations designed to mislead.

## 7. Conclusion

I respectfully request that the Court consider this affidavit, along with the attached Statement of Facts and exhibits, in support of my bankruptcy filing. I affirm that all the information provided herein is true and accurate to the best of my knowledge and belief.


Sworn to before me this _____ day of _____, 2024

_____

Ruth Berenstein

_____

Notary Public