Linda

Linda S Aylward
leafygreenlinda@me.com
847-721-5061

On Jun 11, 2022, at 9:39 AM, Mark Cohen <mark.cohen@generalhealthgroup.com> wrote:

Thank you Megan!

Linda, there is at least 9,000 (**confirmed**) of May's revenue in your bank account. The remainder 20,000 must also be in your bank account because OSI does not have any other bank account on file. Please deposit that by today as well.

Also send me a statement for the month of May. If you have any difficulties getting access to the statements, let me know and I will walk you through it on PNC online banking.

Please deposit this using ACH or Wire below today and send me a confirmation to avoid disruptions and stops to payroll this week.

**FOR ACH PAYMENTS:**

| | |
|---|---|
| Account number | 817722512 |
| Routing number | 021202337 |

**FOR WIRE PAYMENTS:**

|  |  |
|---|---|
| | Account number |
| | 817722512 |
| Routing number | 021000021 |

---------- Forwarded message ------

---
From: **Dr. Gerard Aylward's Office** <palatine@chicagoland4braces.com>
Date: Sat, 11 Jun 2022 at 09:31
Subject: Re: Chicagoland 4 Braces - Report
To: Mark Cohen <mark.cohen@generalhealthgroup.com>

Good morning Mark,

I received the attached TSYS statement in the office yesterday.  This is for credit cards processed in May using the old CC merch services.  $9333.51, with fees deducted of $366.54. There may be a handful of patients in there, but I believe the bulk of these would be insurance payments sent in with a virtual CC to process.  This money went directly to OSI and should have been paid into Dr. A's account in bulk.  It will be interesting if we can make it match with the bank statement I will try to get and the EOBs I am waiting for.

thanks,
Megan

---

**From:** Mark Cohen <mark.cohen@generalhealthgroup.com>
**Sent:** Friday, June 10, 2022 1:12 PM
**To:** Dr. Gerard Aylward's Office <palatine@chicagoland4braces.com>
**Cc:** Mark Cohen <mark.cohen@generalhealthgroup.com>
**Subject:** Re: Chicagoland 4 Braces - Report

Thank you Megan. It's really important that we figure these out asap.

Is OSI responding at all? How many days has it been roughly? Did you call them as well?

 Sender notified by
Mailtrack

On Fri, 10 Jun 2022 at 10:10, Dr. Gerard Aylward's Office <palatine@chicagoland4braces.com> wrote:
> Good morning Mark,
>
> Yes I did, sorry for the delay in response.  I put in a request for some info on insurance payments from OSI, which I am still waiting for.  I want to see how accurate the insurance numbers are.
>
> Some of the payments received in May were not posted into Orthotrac in May but in June.  This is because of the switch to swipe simple and the Tsys issue.
>
> I am still working on more accurate numbers.  For example, in the detail, I am only seeing 1 insurance check for $156 posted.  But the detail shows 118 credit cards processed for 39,592.53. More than I ran, so I am assuming they were  virtual credit cards from insurance companies. The reposted payments in the amount of 1467.08 (7 transactions) could also be insurance. Hoping the EOBs coming from OSI will help clear things up.

It will be so much easier when ALL the payments from patients and carriers are coming directly to us.

I am off today, but working tomorrow 7:30-12:30 with patients.  I will keep working on the numbers next week.

Thanks,
Megan

---

**From:** Mark Cohen <mark.cohen@generalhealthgroup.com>
**Sent:** Friday, June 10, 2022 7:47 AM
**To:** Dr. Gerard Aylward's Office <palatine@chicagoland4braces.com>
**Cc:** Mark Cohen <mark.cohen@generalhealthgroup.com>
**Subject:** Re: Chicagoland 4 Braces - Report

Hi Megan,

Did you get the email below?

 Sender notified by
Mailtrack

<image.gif>
On Wed, 8 Jun 2022 at 13:41, Mark Cohen <mark.cohen@generalhealthgroup.com> wrote:
> Ok so I see payment of 63,840
>
> and in the bank account it's probably.... 40,000-ish.
>
> So can we get a breakdown as to what was insurance and what was debit /credit / cash?

 Sender notified by
Mailtrack

<image.gif>
On Wed, 8 Jun 2022 at 12:09, Dr. Gerard Aylward's Office <palatine@chicagoland4braces.com> wrote:
> Hi Mark,
>
> Attached is the May Summary from OrthoTrac.  Keep in mind that the payment posting errors represent the switch over to Swipe Simple and the issue I had with TSys and OrthoTrac.

We had 16 starts in May - not bad for the end of the school year craziness.  We also have 27 new patient consultations scheduled for June.  I will create a form to track our batting average at huddle.  I will include new consultations and look at recall appointments as well.  Help keep the staff invested into creating starts whenever possible.

Let me know if I can run any detail reports for any day in May.  Or if you need detail on a payment or deposit.

Thanks,

Megan

<Outlook-ux2vcsqs.png>
222 N Plum Grove Rd. Palatine IL. 60067
847-358-9000 phone    847-358-9015 fax
palatine@chicagoland4braces.com email
http://www.chicagoland4braces.com
Find us on Facebook
https://www.facebook.com/DrAylwardOrthodontics/

 Sender notified by
Mailtrack

<TSYS AYLWARD MAY.pdf>

---

**3 attachments**

📄 **StatementPDFServlet (1)-7469 May '22.pdf**
207K

📄 **StatementPDFServlet (1)-9554 May '22.pdf**
208K

📄 **smime.p7s**
2K



Jan 29, 2022 at 7:48 PM

Hi Linda

I got your email. It's going to be very difficult transferring the SBA over to GHG. There needs to be a clear paper trail:

Also if 150,000 was injected into the business by SBA, that means the revenue of 2020 isn't exactly the number presented so we have to redo the analysis for that year (unless this was already mentioned to the other partners)

Remember these first 4-5 acquisitions have to be done with zero discrepancies as we are going to be in it for the long run.



are going to be in it for the long
run.

**▦ 4 Photos**



Hello Linda,

What was the SBA loan used for?

Sun, Sep 26, 9:10 AM

Good morning Lesly,

We used the SBA loan to repay us
personally for the costs needed for
running the Practice while we were
shut down. That included partial
staff payroll, vendors, Dr.'s pay for
March, April and May and the first
half of June, 2020.

The remaining part of that loan
went to an emergency roof
replacement for our home.

The practice was able to recoup
additional payroll and rent through
our smaller PPP forgivable loan of
$54,100. also with SBA, which is in
the final application stage for

Just fyi on what we agreed on
regarding the loan. I hope it
was not misleading as I was
very clear about it because I
know that it will cause
discrepancies if there are no
paper trails  regarding the loan

iMessage

Text Message
Jan 17, 2022 at 6:31 AM

Hi Lesly,

I've had to print business bank statements and note the amounts transferred from our personal account into the business account to cover expenses during the first few months of the pandemic in early 2020

I will notate and scan for you tomorrow.

iMessage

Hi Linda

We need the actual receipts of all the expenses. They can't be just highlights from the amounts on the bank account unfortunately.



Jan 15, 2022 at 8:50 PM

> Ok. I will have mark call them on Monday/Tuesday . (Assuming they're off on Monday)

> How much Cash AR is there by end of month ? (Approximate)

Depends on the month. December was negative, very unusual.

> Also just an FYI, we still haven't received the receipts for the SBA loan, how much has been spent? What is the monthly payment? What is left (if any)?

I will assemble those receipts I can find over this weekend; the monthly payment is about $750., and a little more than

iMessage                    🎤

# GENERALHEALTH GROUP INC

## COMMON STOCK ISSUANCE AGREEMENT

This Common Stock Issuance Agreement (this "***Agreement***") is made as of 1/29/2023 by and between GeneralHealth Group Inc., a Florida corporation (the "***Company***"), and Gerard Aylward ("***Partner***").

1.  **Issuance of Stock.** Subject to the terms and conditions of this Agreement, simultaneously with the execution and delivery of this Agreement by the parties or on such other date as the Company and Partner shall agree (the "***Issuance Date***"), the Company will issue to Partner, and Partner agrees to accept from the Company, _2000_ share of the Company's common stock (the "***Shares***") at a limited market valuation of $400 per share for a total value of $800,000 (the "***Aggregate Purchase Price***"). The Company will deliver to Partner, upon request, a notice of issuance with respect to the Shares as soon as practicable following the execution of this document. As used elsewhere herein, the term "***Shares***" refers to all of the Shares issued hereunder and all securities received in connection with the Shares pursuant to stock dividends or splits, all securities received in replacement of the Shares in a recapitalization, merger, reorganization, exchange or the like, and all new, substituted or additional securities or other property to which Partner is entitled by reason of Partner's ownership of the Shares.

2.  **Founder's Equity. Partner will not be required to pay any consideration for the Shares, directly or indirectly, to any officer, owner, director or employee of the Company or any Subsidiary.**

3.  **Release of All Liabilities**. The Company hereby RELEASES, ACQUITS AND FOREVER DISCHARGES, and WAIVES any and all Claims against the Partner that arise from or relate to their entry and participation in any business activities- including, but not limited to,

    (a)    Borrowing from financial institutions
    (b)    Refinancing of any debt using the Company assets
    (c)    Any lending / borrowing activities that involves signatures of the Company and the Partner

4.  **Limitations on Transfer.** Partner acknowledges and agrees that the Shares issued under this Agreement are subject to (i) the terms and conditions that apply to the Company's Common Stock, as set forth in the Company's Bylaws, as may be in effect at the time of any proposed transfer (the "***Bylaw Provisions***"), and (ii) any other limitation or restriction on transfer created by applicable laws. In addition to the foregoing limitations on transfer, Partner shall not assign, encumber or dispose of any interest in the Shares while the Shares are subject to the Company's Repurchase Option (as defined below). After any Shares have been released from such Repurchase Option, Partner shall not assign, encumber or dispose of any interest in the Shares except to the extent permitted by, and in compliance with the Bylaw Provisions, applicable laws, and the provisions below.

    (a)    **Repurchase Option; Vesting.**

        (i)    In the event off the voluntary or involuntary termination of Partner's Continuous Service Status (as defined below) for any reason (including, without limitation, resignation, death or Disability (as defined below)), with or without cause, the Company shall upon the date of such termination (the "***Termination Date***") have an irrevocable, exclusive option (the "***Repurchase Option***") for a period of 12 months from such date to repurchase the

Shares held by Partner as of the Termination Date at the purchase price per Share (adjusted for any stock splits, stock dividends and the like) specified in Section3(c).

(ii)     Unless the Company notifies Partner within nine months from the Termination Date that it does not intend to exercise its Repurchase Option with respect to some or all of the Shares, the Repurchase Option shall be deemed automatically exercised by the Company as of the end of such 12-month period following such Termination Date, provided that the Company may notify Partner that it is exercising its Repurchase Option as of a date prior to the end of such 12-month period. Unless Partner is otherwise notified by the Company pursuant to the preceding sentence that the Company does not intend to exercise its Repurchase Option as to some or all of the Shares to which it applies at the time of termination, execution of this Agreement by Partner constitutes written notice to Partner of the Company's intention to exercise its
Repurchase Option with respect to all Shares. The Company, at its choice, may satisfy its payment obligation to Partner with respect to exercise of the Repurchase Option by either (A) delivering a check to Partner in the amount of the purchase price for the Shares being repurchased, or (B) in the event Partner is indebted to the Company, canceling an amount of such indebtedness equal to the purchase price for the Shares, or (C) by a combination of (A) and (B) so that the combined payment and cancellation of indebtedness equals such purchase price. In the event of any deemed automatic exercise of the Repurchase Option pursuant to this Section 3(a)(ii) in which Partner is indebted to the Company, such indebtedness equal to the purchase price of the Shares shall be deemed automatically canceled as of the end of the 12-month period following the Termination Date unless the Company otherwise satisfies its payment obligations. As a result of any repurchase of Shares pursuant to this Section 3(a), the Company shall become the legal and beneficial owner of the Shares being repurchased and shall have all rights and interest therein or related thereto, and the Company shall have the right to transfer to its own name the number of Shares being repurchased by the Company, without further action by Partner.

(b)     **Transfer Restrictions; Right of First Refusal.** Before any Shares held by Partner or any transferee of Partner (either being sometimes referred to herein as the "***Holder***") may be sold or otherwise transferred (including transfer by gift or operation of law), the
Company shall first, to the extent the Company's approval is required by any applicable Bylaw Provisions, have the right to approve such sale or transfer, in full or in part, and shall then have the right to purchase all or any part of the Shares proposed to be sold or transferred, in each case, in its sole and absolute discretion (the "***Right of First Refusal***"). If the Holder would like to sell or transfer any Shares, the Holder must provide the Company or its assignee(s) with a Notice (as defined below) requesting approval to sell or transfer the Shares and offering the Company or its assignee(s) a Right of First Refusal on the same terms and conditions set forth in this Section 3(b). The Company may either (1) exercise its Right of First Refusal in full or in part and purchase such Shares pursuant to this Section 3(b), (2) decline to exercise its Right of First Refusal in full or in part and permit the transfer of such Shares to the Proposed Transferee (as defined below) in full or in part or (3) decline to exercise its Right of First Refusal in full or in part and, to the extent the
Company's approval is required by any applicable Bylaw Provisions, decline the request to sell or transfer the Shares in full or in part.

(i)     **Notice of Proposed Transfer.** The Holder of the Shares shall deliver to the Company a written notice (the "***Notice***") stating: (A) the Holder's intention to sell or otherwise transfer such Shares; (B) the name of each proposed Partner or other transferee

("**Proposed Transferee**"); (C) the number of Shares to be sold or transferred to each Proposed Transferee; (D) the terms and conditions of each proposed sale or transfer, including (without limitation) the purchase price for such Shares (the "**Transfer Purchase Price**"); and (E) the Holder's offer to the Company or its assignee(s) to purchase the Shares at the Transfer Purchase Price and upon the same terms (or terms that are no less favorable to the Company).

(ii) **Exercise of Right of First Refusal.** At any time within 30 days after receipt of the Notice, the Company and/or its assignee(s) shall deliver a written notice to the Holder indicating whether the Company and/or its assignee(s) elect to permit or reject the proposed sale or transfer, in full or in part, and/or elect to accept or decline the offer to purchase any or all of the Shares proposed to be sold or transferred to any one or more of the Proposed Transferees, at the Transfer Purchase Price, provided that if the Transfer Purchase Price consists of no legal consideration (as, for example, in the case of a transfer by gift), the purchase price will be the fair market value of the Shares as determined in good faith by the Company. If the Transfer Purchase Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Company in good faith.

(iii) **Holder's Right to Transfer.** If any of the Shares proposed in the Notice to be sold or transferred to a given Proposed Transferee are both (A) not purchased by the Company and/or its assignee(s) as provided in this Section 3(b) and (B) approved by the Company to be sold or transferred, then the Holder may sell or otherwise transfer any such Shares to the applicable Proposed Transferee at the Transfer Purchase Price or at a higher price, provided that such sale or other transfer is consummated within 60 days after the date of the Notice; provided that any such sale or other transfer is also effected in accordance with the Bylaw Provisions and any applicable laws and the Proposed Transferee agrees in writing that the Bylaw Provisions and the provisions of this Agreement, including this Section 3 shall continue to apply to the Shares in the hands of such Proposed Transferee. The Company, in consultation with its legal counsel, may require the Holder to provide an opinion of counsel evidencing compliance with applicable laws. If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, or if the Holder proposes to change the price or other terms to make them more favorable to the Proposed Transferee, a new Notice shall be given to the Company, and the Company and/or its assignees shall again have the right to approve such transfer and be offered the Right of First Refusal.

(c) **Company's Right to Purchase upon Involuntary Transfer.** In the event of any transfer by operation of law or other involuntary transfer (including divorce or intestate transfer upon death) of all or a portion of the Shares by the record holder thereof, the Company shall have an option to purchase any or all of the Shares transferred at the fair market value of the Shares on the date of transfer (as determined by the Company in its sole discretion). Upon such a transfer, the Holder shall promptly notify the Secretary of the Company of such transfer. The right to purchase such Shares shall be provided to the Company for a period of 30 days following receipt by the Company of written notice from the Holder.

(d)     **Assignment.** The right of the Company to purchase any part of the Shares may be assigned in whole or in part to any holder or holders of capital stock of the Company or other persons or organizations.

(e)     **Restrictions Binding on Transferees.** All transferees of Shares or any interest therein will receive and hold such Shares or interest subject to the Bylaw Provisions and the provisions of this Agreement, including, without limitation, Section 3, including, insofar as applicable, the Repurchase Option. In the event of any purchase by the Company hereunder where the Shares or interest are held by a transferee, the transferee shall be obligated, if requested by the Company, to transfer the Shares or interest to Partner for consideration equal to the amount to be paid by the Company hereunder. Any sale or transfer of the Shares shall be void unless the provisions of this Agreement are satisfied.

(f)     **Termination of Rights.** The transfer restrictions set forth in Section 3(b) above, the Right of First Refusal granted the Company by Section 3(b) above and the right to repurchase the Shares in the event of an involuntary transfer granted the Company by Section 3(c) above shall terminate upon (i) the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "***Securities Act***") (other than a registration statement relating solely to the issuance of Common Stock pursuant to a business combination or an employee incentive or benefit plan) or (ii) any transfer or conversion of Shares made pursuant to a statutory merger or statutory consolidation of the Company with or into another corporation or corporations if the common stock of the surviving corporation or any direct or indirect parent corporation thereof is registered under the Securities Exchange Act of 1934, as amended (the "***Exchange Act***").

(g)     **Lock-Up Agreement.** If so requested by the Company or the underwriters in connection with the initial public offering of the Company's securities registered under the Securities Act of 1933, as amended, Partner shall not sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company however or whenever acquired (except for those being registered) without the prior written consent of the Company or such underwriters, as the case may be, for 180 days from the effective date of the registration statement, plus such additional period, to the extent required by FINRA rules, up to a maximum of 216 days from the effective date of the registration statement, and Partner shall execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of such offering.

4.     **Investment and Taxation Representations.** In connection with the purchase of the Shares, Partner represents to the Company the following:

(a)     Partner is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares. Partner is purchasing the Shares for investment for Partner's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act or under any applicable provision of state law. Partner does not have any present intention to transfer the Shares to any other person or entity.

(b)     Partner understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Partner's investment intent as expressed herein.

(c)     Partner further acknowledges and understands that the securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Partner further acknowledges and understands that the Company is under no obligation to register the securities.

(d)     Partner is familiar with the provisions of Rule 144, promulgated under the Securities Act, which, in substance, permits limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of the securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions. Partner understands that the Company provides no assurances as to whether he or she will be able to resell any or all of the Shares pursuant to Rule 144, which rule requires, among other things, that the Company be subject to the reporting requirements of the Exchange Act, that resales of securities take place only after the holder of the Shares has held the Shares for certain specified time periods, and under certain circumstances, that resales of securities be limited in volume and take place only pursuant to brokered transactions. Notwithstanding this Section 4(d), Partner acknowledges and agrees to the restrictions set forth in Section 4(e) below.

(e)     Partner further understands that in the event all of the applicable requirements of Rule 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption will be required; and that, notwithstanding the fact that Rule 144 is not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

(f)     Partner represents that Partner is not subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act. Partner also agrees to notify the Company if Partner becomes subject to such disqualifications after the date hereof.

(g)     Partner understands that Partner may suffer adverse tax consequences as a result of Partner's purchase or disposition of the Shares. Partner represents that Partner has consulted any tax consultants Partner deems advisable in connection with the purchase or disposition of the Shares and that Partner is not relying on the Company for any tax advice.

5.     **Restrictive Legends and Stop-Transfer Orders.**

(a)     **Legends.** Any stock certificate or, in the case of uncertificated securities, any notice of issuance, for the Shares, shall bear the following legends (as well as any legends required by the Company or applicable state and federal corporate and securities laws):

(i)    "THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(ii)    "THE SECURITIES REFERENCED HEREIN MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE."

(iii)    "THE TRANSFER OF SECURITIES REFERENCED HEREIN IS SUBJECT TO RESTRICTIONS REQUIRING APPROVAL OF THE COMPANY PURSUANT TO AND IN ACCORDANCE WITH THE COMPANY'S BYLAWS, COPIES OF WHICH MAY BE OBTAINED UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS. THE COMPANY SHALL NOT REGISTER OR OTHERWISE RECOGNIZE OR GIVE EFFECT TO ANY PURPORTED TRANSFER OF SHARES OF STOCK THAT DOES NOT COMPLY WITH THE COMPANY'S BYLAWS."

(b)    **Stop-Transfer Notices.** Partner agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)    **Refusal to Transfer.** The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any Partner or other transferee to whom such Shares shall have been so transferred.

(d)    **Required Notices.** Partner acknowledges that the Shares are issued and shall be held subject to all the provisions of this Section 5, the Certificate of Incorporation and the Bylaws of the Company and any amendments thereto, copies of which are on file at the principal office of the Company. A statement of all of the rights, preferences, privileges and restrictions granted to or imposed upon the respective classes and/or series of shares of stock of the Company and upon the holders thereof may be obtained by any stockholder upon request and without charge, at the principal office of the Company, and the Company will furnish any stockholder, upon request and without charge, a copy of such statement. Partner acknowledges that the provisions of this Section 5 shall constitute the notices required by Sections 151(f) and 202(a) of the Delaware General Corporation Law and Partner hereby expressly waives the requirement of Section 151(f) of the Delaware General Corporation Law that it receive the written notice provided for in Sections 151(f) and 202(a) of the Delaware General Corporation Law within a reasonable time after the issuance of the Shares.]

6. **No Employment Rights.** Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent, subsidiary or affiliate of the Company, to terminate Partner's employment or consulting relationship, for any reason, with or without cause.

7. **Certain Defined Terms.**

(a) **"Affiliate"** means an entity other than a Subsidiary which, together with the Company, is under common control of a third person or entity.

(b) **"Consultant"** means any person, including an advisor but not an Employee, who is engaged by the Company, or any Parent, Subsidiary or Affiliate, to render services (other than capital-raising services) and is compensated for such services, and any Director whether compensated for such services or not.

(c) **"Continuous Service Status"** means the absence of any interruption or termination of service as an Employee or Consultant. Continuous Service Status as an Employee or Consultant shall not be considered interrupted or terminated in the case of: (i) Company approved sick leave; (ii) military leave; (iii) any other bona fide leave of absence approved by the Company, provided that such leave is for a period of not more than ninety (90) days, unless reemployment upon the expiration of such leave is guaranteed by contract or statute, or unless provided otherwise pursuant to a written Company policy. Also, Continuous Service Status as an Employee or Consultant shall not be considered interrupted or terminated in the case of a transfer between locations of the Company or between the Company, its Parents, Subsidiaries or Affiliates, or their respective successors, or a change in status from an Employee to a Consultant or from a Consultant to an Employee.

(d) **"Director"** means a member of the Board of Directors of the Company.

(e) **"Disability"** means "disability" within the meaning of Section 22(e)(3) of the Code.

(f) **"Employee"** means any person employed by the Company, or any Parent, Subsidiary or Affiliate, with the status of employment determined pursuant to such factors as are deemed appropriate by the Board of Directors of the Company in its sole discretion, subject to any requirements of applicable laws, including the Code. The payment by the Company of a director's fee shall not be sufficient to constitute "employment" of such director by the Company or any Parent, Subsidiary or Affiliate.

(g) **"Parent"** means any corporation (other than the Company) in an unbroken chain of corporations ending with the Company if each of the corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

(h) **"Subsidiary"** means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

8. **Miscellaneous.**

(a) **Governing Law.** The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to the exclusive jurisdiction of the State of Delaware and agree that any such litigation shall be conducted only in the courts of Delaware and no other courts.

(b) **Entire Agreement.** This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c) **Amendments and Waivers.** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

(d) **Successors and Assigns.** Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

(e) **Notices.** Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(f) **Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(g) **Construction.** This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(h)     **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement. Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile or scanned signature will be deemed an original and valid signature.

(i)     **Electronic Delivery.** The Company may, in its sole discretion, decide to deliver any documents related to this Agreement or any notices required by applicable law or the Company's Certificate of Incorporation or Bylaws by email or any other electronic means. Partner hereby consents to (i) conduct business electronically (ii) receive such documents and notices by such electronic delivery and (iii) sign documents electronically and agrees to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

*(Remainder of this page intentionally left blank; signatures begin on the next page.)*

The parties have executed this Common Stock Issuance Agreement as of the date first set forth above.

**THE COMPANY:**

GENERALHEALTH GROUP INC.

By: *Ruth Berenstein*

(Signature)

Name: Ruth Berenstein
Title: Managing Director

Address:
**244 5th Ave, 2nd Floor**
**New York, NY 10001**

United States

**PARTNER:**

**Gerard Aylward DDS**

By: *Gerard Aylward*

(Signature)

Name: _Gerard Aylward

Address:

249 KIMBERLY RD.
NORTH BARRINGTON, IL 60010 -2148

Email: GERRYAYLWARD 7 @ gmail.com

**Aylward Enterprises Inc**

By: _Gerard Aylward_

Email: LINDA. AYLWARD 2 @ gmail. com


## Re: Oct. '21 through May '22 Business Card Statements
1 message

**Linda Aylward** <leafygreenlinda@me.com>                                                  Thu, May 26, 2022 at 9:35 PM
To: Mark Cohen <mark.cohen@generalhealthgroup.com>
Cc: Lesly Lopez <lesly.lopez@generalhealthgroup.com>, gerry aylward <gerryaylward7@gmail.com>

Hi Mark,

Those final insurance payments we are receiving are for past work performed prior to May 1. They process on a normal insurance lag time through Orthosynetics etc. and should come directly to us.

We would prefer to use those last insurance payments to reduce the business credit card balance. The charges on the credit card are for Pitts clinical materials and other business expenses etc.

Coincidentally I just got off the phone with Gerry.  This morning he took a hard look at the progress of some cases in the practice which are seen by Dr Kim Smith. He has a recommendation for you and Lesly about the clinical side of the operation.

He is just reaching out to Lesly and you to discuss.

Kind regards,
Linda
Sent from my iPhone
847-721-5061

> On May 26, 2022, at 10:39 AM, Mark Cohen <mark.cohen@generalhealthgroup.com> wrote:

> Hi Linda & Team,

> A few pointers

> So the practice is officially in about 60,000 of debt rather than 60,000 AR.

> There are 26,000 of bill.com payments, 20,000 of credit card debt and 10,000 of renovations.

> Why are you applying for payments after May 1st? These funds don't belong to Dr A. or yourself. If you are applying any funds to this debt it should be before May 1st. I am a little confused.

> Also, why do we have Dr Smith working in the practice when we are close to 60,000 in debt?


Sender notified by
Mailtrack

On Wed, 25 May 2022 at 19:59, Linda Aylward <leafygreenlinda@me.com> wrote:

Hi Lesly and Mark,

Note a total of about $13,000 in our line of credit in December and April to cover payroll. We tried to keep up on the balance, but slowly we dropped behind. Those two poorly performing months made it hard to aggressively pay down the balance. Also the additional $5600/month for Dr. Smith slowly chipped away at our available cash, even with an increased number of hours to see patients.

We also needed to tap our line of credit in another business card of about $3300. I will send that statement as well.

Our current balance is about $20,800. Every time insurance is paid for amounts owed prior to May '22, we are transferring some into this account and the second account referenced above. Currently we have a balance of about $3200. in our business account ending in -7469.
Linda

Linda S Aylward
leafygreenlinda@me.com
847-721-5061

## SCHEDULE 1.05
## PURCHASE PRICE ALLOCATION


**ATTACHED**

# *Asset Purchase Agreement*

Schedule 1.05

Purchase Price Allocation

Clinical Equipment: $170,000

Furniture and Fixtures: $20,000

Clinical & Lab Inventory: $40,000

Non-Compete Agreement: $450,000

Patient Lists: $220,000

Goodwill/Website: $320,000

Accounts Receivable: $60,000 approx.

Total: $1,280,000

## SCHEDULE 2.03
## LIST OF DUE DILIGENCE MATERIALS

### (a) Seller Records

Seller's articles of incorporation, as amended to date, and any certificates qualifying Seller to do business in any other state.

The bylaws of Seller, as currently in effect.

Seller's books and ledgers evidencing the Shareholders' ownership of Seller.

All annual reports and any other communications to Seller's Shareholders for the last three years.

### (b) Governmental Regulations and Filings

Reports filed and significant correspondence with any state or federal regulatory agencies during the past two years.

All of Seller's material governmental permits, licenses, and other issuances and copies of governmental regulations affecting Seller's business.

### (c) Material Agreements

All material service, production, manufacturing, sale, agency, distribution, and advertising contracts to which Seller is a party.

All significant purchase-order, material-supply, or requirements contracts to which Seller is a party.

Form of product warranties, if any, of products manufactured or distributed by Seller.

All material agreements encumbering real or personal property owned by Seller, including all mortgages, deeds of trust, and security agreements.

All significant deeds or leases of real property and all leases of any substantial amount of personal property to which Seller is a party, either as lessor or lessee.

All other material agreements to which Seller is a party, including government contracts.

### (d) Employment and Management Matters

Documents representing any bonus, retirement, profit-sharing, incentive-compensation, pension, and other employee-benefit plans or agreements, including employment agreements or arrangements of Seller's officers and key personnel.

### (e) Litigation and Proceedings

A schedule of all pending or threatened significant suits, actions, litigations, administrative proceedings, or other governmental investigations or inquiries affecting Seller.

### (f) Financial Condition

All current financial, sales, and other projections for Seller's consolidated operations.

Seller shall deliver any other documents reasonably requested by GHG within 10 business days after the request.

**SCHEDULE 3.06**
**LIST OF ACQUIRED ASSETS**

**ATTACHED**

## SCHEDULE 3.01
## LIST OF PERMITTED ENCUMBRANCES

TIAA Financing Agreement for Carestream 3-D X-Ray- $1590.09 per month for 36 months as of 3/2022

Lease Agreement for 222 North Plum Grove Road, Palatine, IL 60067

~~SBA Loan as of 9/7/2021 in the amount of $86,000~~