

RCV 06/21/2021 via Mail certified PRW

June 18, 2021

ATTN: Dr. Michael G. Neret
1809 Merlin Street
Bay City, TX 77414-3131

SENT VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED

Dear Dr. Michael G. Neret,

WellMed Medical Management processes and pays claims for members enrolled in Medicare Advantage plans. WellMed is required by the Centers for Medicare & Medicaid Services (CMS) to analyze claims payment data in order to identify areas with the greatest risk of inappropriate program payment. Specifically, WellMed is required to investigate situations of potential fraud, waste, and abuse.

Your practice has been referred to the Payment Integrity division due to concerns with your billing practices. Specifically, we have noticed the improper use of the CPT code range of Q4100-Q4255 accompanied by an injectable procedure as "regenerative medicine" which, is not FDA approved, is considered experimental and investigational. Experimental and investigational items are not covered by Medicare and will be denied as such. This correspondence is to notify you that collection of overpayment(s) made on our part to you or your company is to occur.

The total overpayment due is **$77,836.27**. Auto recoupment of this overpayment has been set. If you prefer to make the refund by check instead, please advise this office immediately and send your overpayment to:

WellMed Medical Management

Attn: Payment Integrity Team
12459 Network Blvd, Suite 101
San Antonio, TX 78249
Pi_comms@wellmed.net

Please immediately discontinue the practice of inappropriately billing the CPT code range of Q4100-Q4255 that are injected. Continued submission of claims in the aforementioned ways misrepresents the services as other than investigational and experimental. Failure to correct these issues immediately may result in administrative actions being taken.

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process. Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice so as to assure that we handle

Confidentiality Notice: This communication and any attachments may contain privileged or other confidential information protected by HIPAA legislation (45 CFR, Parts 160 and 164), Section 13402 of Title XIII (Health Information Technology for Economic and Clinical Health Act) of the American Recovery and Reinvestment Act of 2009, and additional state and federal privacy and security laws. If you are not the intended recipient or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information and notify the Compliance Department at (210) 617-4736 or Compliance@WellMed.net so that we can arrange for destruction or return to us at no cost to you.



your situation properly. If possible, when notifying us about the bankruptcy, please include the name the bankruptcy is filed under and the district where the bankruptcy is filed.

Title XVIII of the Social Security Act, 1862(a)(1)(A) states that no Medicare payment shall be made for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury. Please refer to U.S. Food & Drug Administration Tissue & Tissue Products for guidance. The FDA does not refer to any product or class of products as "skin substitutes."

Providers are responsible for being aware of correct claim filing procedures and must use care when billing and accepting payment. In this situation, you billed and/or received payment for services you should have known you were not entitled to.

If you have any questions regarding the letter, please contact WellMed Payment Integrity via email at pi_comms@wellmed.net.

Effective 3/20/2021, WellMed is offering a claims portal tool. The portal may be accessed using this link: https://americas.pch.global/PCHGlobal/website/Signin.aspx

Follow the link on the home page to register for an account if you do not already have one. Once you have created an account, select WellMed Upload from the submission menu to submit your request.

If you have any questions regarding these matters, please contact Payment Integrity at the address listed above, or at pi_comms@wellmed.net. Your prompt attention to this matter is greatly appreciated.


Sincerely,

WellMed Medical Management

Payment Integrity Team
Enclosure-Addendum 1

References:

1.) https://www.fda.gov/vaccines-blood-biologics/tissue-tissue-products
2.) https://www.fda.gov/vaccines-blood-biologics/consumers-biologics/consumer-alert-regenerative-medicine-products-including-stem-cells-and-exosomes
3.) https://www.fda.gov/vaccines-blood-biologics/safety-availability-biologics/public-safety-notification-exosome-products
4.) https://www.fda.gov/consumers/consumer-updates/fda-warns-about-stem-cell-therapies

Confidentiality Notice  This communication and any attachments may contain privileged or other confidential information protected by HIPAA legislation (45 CFR, Parts 160 and 164), Section 13402 of Title XIII (Health Information Technology for Economic and Clinical Health Act) of the American Recovery and Reinvestment Act of 2009, and additional state and federal privacy and security laws. If you are not the intended recipient or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information and notify the Compliance Department at (210) 617-4736 or Compliance@WellMed.net so that we can arrange for destruction or return to us at no cost to you.



Addendum 1

| Member Name | Date of Birth | Claim Number | Date of service | Line Number | Procedure Code | Service Amount Paid and Line Overpayment Amount |
|---|---|---|---|---|---|---|
| STEVENS, VICKIE F | 12/9/1955 | 200317897157 | 3/3/2020 | 1 | 20605 | $50.26 |
| STEVENS, VICKIE F | 12/9/1955 | 200317897157 | 3/3/2020 | 3 | Q4177 | $2,822.40 |
| CAMPBELL, BETTY M | 7/12/1955 | 200317897158 | 2/26/2020 | 1 | 20610 | $59.56 |
| CAMPBELL, BETTY M | 7/12/1955 | 200317897158 | 2/26/2020 | 2 | Q4177 | $2,822.40 |
| SMALL, LEON | 6/18/1944 | 200317897161 | 2/25/2020 | 1 | 20610 | $59.56 |
| SMALL, LEON | 6/18/1944 | 200317897161 | 2/25/2020 | 2 | Q4177 | $2,822.40 |
| SMALL, LEON | 6/18/1944 | 200321186046 | 2/25/2020 | 1 | 99213 | $71.63 |
| SMALL, LEON | 6/18/1944 | 200321186046 | 2/25/2020 | 3 | Q4174 | $0.16 |
| SMALL, LEON | 6/18/1944 | 200321186046 | 2/25/2020 | 4 | 20610 | $59.56 |
| CAMPBELL, BETTY M | 7/12/1955 | 200404752255 | 3/27/2020 | 1 | 20610 | $59.56 |
| CAMPBELL, BETTY M | 7/12/1955 | 200404752255 | 3/27/2020 | 2 | Q4177 | $2,822.40 |
| WILLIAMS, ELIZABETH B | 7/4/1941 | 200428691591 | 2/24/2020 | 1 | Q4177 | $2,822.40 |
| WILLIAMS, ELIZABETH B | 7/4/1941 | 200428691591 | 2/24/2020 | 2 | 20610 | $59.56 |
| STEVENS, VICKIE F | 12/9/1955 | 200509148086 | 2/25/2020 | 1 | 99213 | $71.63 |
| STEVENS, VICKIE F | 12/9/1955 | 200509148086 | 2/25/2020 | 2 | Q4177 | $3.14 |
| STEVENS, VICKIE F | 12/9/1955 | 200509148086 | 2/25/2020 | 3 | 20610 | $59.56 |
| SMALL, LEON | 6/18/1944 | 200605306310 | 5/27/2020 | 1 | Q4177 | $2,880.00 |
| SMALL, LEON | 6/18/1944 | 200605306310 | 5/27/2020 | 2 | 20610 | $60.89 |
| LUTRINGER, LILLIE J | 8/18/1943 | 200605306419 | 5/21/2020 | 1 | Q4177 | $2,880.00 |
| LUTRINGER, LILLIE J | 8/18/1943 | 200605306419 | 5/21/2020 | 2 | 20610 | $60.89 |
| WILLIAMS, ELIZABETH B | 7/4/1941 | 200605306465 | 5/26/2020 | 1 | Q4177 | $2,880.00 |
| WILLIAMS, ELIZABETH B | 7/4/1941 | 200605306465 | 5/26/2020 | 2 | 20610 | $60.89 |
| STEVENS, VICKIE F | 12/9/1955 | 200605306489 | 5/26/2020 | 1 | Q4177 | $2,880.00 |
| STEVENS, VICKIE F | 12/9/1955 | 200605306489 | 5/26/2020 | 2 | 20610 | $60.89 |
| LUTRINGER, LILLIE J | 8/18/1943 | 200606372061 | 2/21/2020 | 1 | 99213 | $71.63 |
| LUTRINGER, LILLIE J | 8/18/1943 | 200606372061 | 2/21/2020 | 2 | Q4177 | $2,822.40 |
| LUTRINGER, LILLIE J | 8/18/1943 | 200606372061 | 2/21/2020 | 3 | 20610 | $59.56 |
| GOODMAN, JODIE L | 7/4/1968 | 200612604188 | 6/4/2020 | 1 | Q4177 | $2,880.00 |
| GOODMAN, JODIE L | 7/4/1968 | 200612604188 | 6/4/2020 | 2 | 20610 | $60.89 |
| STEVENS, VICKIE F | 12/9/1955 | 200612605291 | 6/3/2020 | 1 | Q4177 | $2,880.00 |

Confidentiality Notice: This communication and any attachments may contain privileged or other confidential information protected by HIPAA legislation (45 CFR, Parts 160 and 164), Section 13402 of Title XIII (Health Information Technology for Economic and Clinical Health Act) of the American Recovery and Reinvestment Act of 2009, and additional state and federal privacy and security laws. If you are not the intended recipient or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information and notify the Compliance Department at (210) 617-4736 or Compliance@WellMed.net so that we can arrange for destruction or return to us at no cost to you.



| | | | | | | |
|---|---|---|---|---|---|---|
| STEVENS, VICKIE F | 12/9/1955 | 200612605291 | 6/3/2020 | 2 | 20606 | $82.92 |
| GOODMAN, JODIE L | 7/4/1968 | 200619983448 | 6/15/2020 | 1 | Q4177 | $2,880.00 |
| GOODMAN, JODIE L | 7/4/1968 | 200619983448 | 6/15/2020 | 2 | 20610 | $60.89 |
| COSTON, MICHAEL G | 4/11/1962 | 200710962635 | 7/6/2020 | 1 | Q4177 | $2,880.00 |
| COSTON, MICHAEL G | 4/11/1962 | 200710962635 | 7/6/2020 | 2 | 20610 | $60.89 |
| COSTON, MICHAEL G | 4/11/1962 | 200711026786 | 6/4/2020 | 1 | Q4177 | $2,880.00 |
| COSTON, MICHAEL G | 4/11/1962 | 200711026786 | 6/4/2020 | 2 | 20610 | $60.89 |
| COSTON, MICHAEL G | 4/11/1962 | 200803167534 | 7/20/2020 | 1 | Q4177 | $2,880.00 |
| COSTON, MICHAEL G | 4/11/1962 | 200803167534 | 7/20/2020 | 2 | 20610 | $60.89 |
| COSTON, MICHAEL G | 4/11/1962 | 200803167606 | 7/13/2020 | 1 | Q4177 | $2,880.00 |
| COSTON, MICHAEL G | 4/11/1962 | 200803167606 | 7/13/2020 | 2 | 20610 | $60.89 |
| LUTRINGER, LILLIE J | 8/18/1943 | 200926066230 | 8/21/2020 | 1 | Q4177 | $2,880.00 |
| LUTRINGER, LILLIE J | 8/18/1943 | 200926066230 | 8/21/2020 | 2 | 20610 | $60.89 |
| STEVENS, VICKIE F | 12/9/1955 | 200926066276 | 9/4/2020 | 1 | Q4177 | $2,880.00 |
| STEVENS, VICKIE F | 12/9/1955 | 200926066276 | 9/4/2020 | 2 | 20605 | $51.39 |
| STEVENS, LARRY L | 2/5/1955 | 200927087009 | 8/26/2020 | 1 | Q4177 | $2,880.00 |
| STEVENS, LARRY L | 2/5/1955 | 200927087009 | 8/26/2020 | 2 | 20610 | $60.89 |
| COSTON, MICHAEL G | 4/11/1962 | 200927087037 | 9/4/2020 | 1 | Q4177 | $3,203.59 |
| COSTON, MICHAEL G | 4/11/1962 | 200927087037 | 9/4/2020 | 2 | 20610 | $60.89 |
| GOODMAN, JODIE L | 7/4/1968 | 200927087073 | 9/4/2020 | 1 | Q4177 | $2,880.00 |
| GOODMAN, JODIE L | 7/4/1968 | 200927087073 | 9/4/2020 | 2 | 20610 | $60.89 |
| STEVENS, VICKIE F | 12/9/1955 | 200927087075 | 8/26/2020 | 1 | Q4177 | $3,222.58 |
| STEVENS, VICKIE F | 12/9/1955 | 200927087075 | 8/26/2020 | 2 | 20610 | $60.89 |
| WILLIAMS, ELIZABETH B | 7/4/1941 | 200927087094 | 8/26/2020 | 1 | Q4177 | $2,880.00 |
| WILLIAMS, ELIZABETH B | 7/4/1941 | 200927087094 | 8/26/2020 | 2 | 20610 | $60.89 |
| SMALL, LEON | 6/18/1944 | 200927087116 | 8/28/2020 | 1 | Q4177 | $2,880.00 |
| SMALL, LEON | 6/18/1944 | 200927087116 | 8/28/2020 | 2 | 20610 | $60.89 |
| COSTON, MICHAEL G | 4/11/1962 | 201112668411 | 11/9/2020 | 1 | Q4177 | $3,600.00 |
| COSTON, MICHAEL G | 4/11/1962 | 201112668411 | 11/9/2020 | 2 | 20610 | $60.89 |

Confidentiality Notice. This communication and any attachments may contain privileged or other confidential information protected by HIPAA legislation (45 CFR, Parts 160 and 164), Section 13402 of Title XIII (Health Information Technology for Economic and Clinical Health Act) of the American Recovery and Reinvestment Act of 2009, and additional state and federal privacy and security laws. If you are not the intended recipient or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information and notify the Compliance Department at (210) 617-4736 or Compliance@WellMed.net so that we can arrange for destruction or return to us at no cost to you.

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (the "Lease") is made and entered into this January 10th 2023 by and between Michel Neret, described below as "Landlord", and GeneralHealthGroup Inc., described below as "Tenant".

**BASIC LEASE PROVISIONS**

| | | |
|---|---|---|
| 1.1 | Landlord: | MICHEL NERET<br>54 Flag Lake Plz<br>Lake Jackson, TX 77566 |
| 1.2 | Tenant: | GeneralHealthGroup Inc.<br>244 5th Ave, 2nd<br>Floor New York, NY<br>10001 |
| 1.3 | Permitted Uses: | Medical Office |
| 1.4 | Premises: | **54 Flag Lake** |
| 1.5 | Net Rentable Area (Sq. Ft.): | **3900 SQFT** |
| 1.6 | Rent/Operating Expenses: | **$6,500 + NNN** |
| 1.7 | Terms: | 5 years commencing January 31st, 2023 |

In witness whereof, the parties hereto have executed this Lease consisting of the foregoing provisions and of the Additional Lease Provisions which follow, as of the date first above written.

THIS LEASE SHALL NOT BECOME EFFECTIVE UNTIL EXECUTED BY LANDLORD AND TENANT. NO PARTY, INCLUDING LANDLORD'S AGENT OR ANY PERSON WITH WHOM TENANT MAY HAVE NEGOTIATED THIS LEASE, HAS ANY AUTHORITY TO MODIFY THE TERMS HEREOF OR TO MAKE ANY AGREEMENTS, REPRESENTATIONS, OR PROMISES UNLESS THE SAME ARE CONTAINED HEREIN OR ADDED HERETO IN WRITING SIGNED BY LANDLORD.

"Landlord" "Tenant"

By: DocuSigned by: DE57C4676EB0486... By: DocuSigned by: Ruth Berenstein BB9EE191224C430...

Name: Michael Neret Name: GeneralHealthGroup Inc

Date: Date:

**ADDITIONAL LEASE PROVISIONS**

## 1 PREMISES; CONSTRUCTION

**1.1** Description of Premises. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord the Premises, in accordance with the provisions set forth herein. The "Project" consists of the building, parking facilities, sidewalks, landscaping, and all other improvements at the location described in the Basic Lease Provisions. The structure located upon the Property is called the "Building." The Premises consist of a portion of the Building.

**1.2** Easements Demised. Landlord does hereby further grant to Tenant a non-exclusive easement for the use of those portions of the Project to be used in common by all Tenants of the Project, and their business guests, patients and invitees, including sidewalks, driveways, parking areas, entrances, lobbies, hallways, stairways, elevators, public restrooms and other similar facilities (the "Common Areas") to be designated by Landlord and which are to be used in accordance with rules and regulations adopted by Landlord.

## 2 TERM

**2.1** Length of Term. The initial term of this Lease shall be for the period defined as the Term, plus the partial calendar month, if any, occurring after the Commencement Date.

**2.2** Tenant shall have the option to renew this Lease for one (1) additional (the Extended Term) three (3) year term (the Extended Term), provided:

2.2.1 That written notice of exercise of the option be delivered to Landlord at least 120 days prior to the expiration of the original Lease Term.

2.2.2 That Tenant is current on Tenant s obligations under this Lease and is not in default under any of the terms and conditional of this Lease.

2.2.3 That the Lease rental rate shall increase 3% at the beginning of every 12 months.

DS RB DS

**2.3** Commencement Date. The Commencement Date shall be the earlier to occur of (i) the date possession of the Premises is delivered to Tenant or (ii) the date Tenant occupies, commences alterations to or conducts business in all or any part of the Premises. Upon occupancy, Tenant and Landlord shall execute a certificate setting forth the Commencement Date of this Lease.

**2.4** Possession. Written notice from Landlord to Tenant that the Premises are available for occupancy on a specific date shall constitute delivery of possession of the Premises to Tenant, whether Tenant is in possession. In the event Tenant is not in actual occupancy of the Premises within thirty (30) days after such notice, Landlord may cancel this Lease by notice to Tenant fifteen (15) days prior to the effective date of such cancellation.

**2.5** Acceptance of Premises. Occupying all or any portion of the Premises by Tenant shall be conclusive that the Premises are in satisfactory condition and acceptable to Tenant subject to latent defects and deficiencies listed in writing and delivered to Landlord within ten (10) days after Tenant's occupancy.

## 3 BASIC MONTHLY RENT

**3.1** Rental for the Lease Premises shall be paid to Landlord at the address listed in 1.1.

**3.2** Rental for the period beginning with the beginning date of the lease and ending the first Anniversary Date thereafter shall be $6,500.00 per month. Tenant shall pay the Base Rent, including any escalation thereof as outlined in Article 2.2.3, in advance and continuing hereafter on the first day of every calendar month of the Term or Extended Terms of this Lease.

**3.3** Rent is payable on the 1st day of each month with a five (5) day grace period, up to and including the first day of the last month of the final Lease year in the amounts detailed herein.

## 4 UTILITIES AND SERVICE

**4.1** **Obligations of Tenant.** During the Term, Tenant agrees to pay all real property taxes of any kind which may be assessed against the Lease Premises during the term of this Lease. In addition, Tenant agrees to pay for

fire and general liability insurance on the building. Tenant agrees to pay the following utilities and services:

a) Electricity.

b) Water.

c) Gas.

d) Sewer and Waste.

## 5 SECURITY DEPOSIT

5.1 **Deposit**. Tenant has deposited with Landlord the Security Deposit as security for the faithful performance by Tenant of all the terms, covenants and conditions required to be performed by Tenant hereunder. The Security Deposit shall be returned to Tenant (or, at Landlord's option, to the last assignee of Tenant's interest hereunder) after the expiration of this Lease and delivery of possession of the Premises to Landlord if, at such time, Tenant has performed fully and faithfully all the terms, covenants, and conditions hereof. In the event of termination of Landlord's interest in this Lease; Landlord shall transfer or credit the Security Deposit to Landlord's successor in interest, and Landlord shall thereupon be released from any liability for the return of the Security Deposit or the accounting therefor. Prior to the time when Tenant is entitled to any return of the Security Deposit, Landlord may intermingle the Security Deposit with its own funds and use the Security Deposit for such purposes as Landlord may determine. Tenant shall not be entitled to any interest on the Security Deposit.

5.2 **Default**. If Tenant is in default, as set forth in Section 14 hereof, Landlord may use, apply or retain all or any part of the Security Deposit for the payment of any monetary obligation due hereunder or to compensate Landlord for any other expense or cost which Landlord may expend, or any loss or damage which Landlord may suffer, by reason of Tenant's default under the terms hereof, including any damages or deficiency in the reletting of the Premises. If any portion of the Security Deposit is so used or applied, regardless of whether such use or application is before or after Tenant has ceased to occupy the Premises, Tenant shall, within five (5) days after written demand therefor, deposit with Landlord, cash in an amount sufficient to restore the Security Deposit to its original amount.

## 6 MORTGAGE BY LANDLORD

6.1 **Right to Mortgage**. Landlord shall have the right to transfer, assign, mortgage or convey in whole or in part the Premises and all its rights under this Lease, and nothing herein shall be construed as a restriction upon Landlord's so doing.

6.2 **Subordination**. Tenant agrees that this Lease shall be subject and subordinate to any mortgage or trust deed heretofore or hereafter placed by Landlord or its successors in interest upon its interest in said Premises to secure the payment of monies loaned, interest thereon, and other obligations. Tenant agrees to execute and deliver, upon demand of Landlord, all instruments desired by Landlord subordinating in the manner requested by Landlord this Lease to such mortgage, trust deed or like encumbrance. Tenant further appoints Landlord as its attorney in fact for the term of this Lease to execute on behalf of Tenant any such instruments subordinating this Lease to any such mortgage, deed of trust or other encumbrance.

6.3 **Attornment**. In the event any proceedings are brought for foreclosure or in the event of the exercise of the power of sale under any mortgage or deed of trust covering the Project Tenant shall attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as Landlord under this Lease, provided, however, that so long as Tenant is not in default hereunder, this Lease shall remain in full force and effect.

6.4 **Estoppel Certificate**. Tenant shall, within five (5) business days after Landlord's request therefor, execute and deliver to Landlord an Estoppel Certificate in recordable form setting forth the following: (a) a ratification of this Lease; (b) the Commencement Date and termination date hereof; (c) a certificate that this Lease is in full force and effect and has not been assigned, modified, supplemented or amended (except by such writing as shall be stated); (d) that all conditions under this Lease to be performed by Landlord have been satisfied (unless otherwise specified); (e) that there are no defenses or offsets against the enforcement of this Lease

by Landlord, or, in the alternative, those claimed by Tenant (unless otherwise specified); (f) the amount of advance rent, if any, (or none if such is the case) paid by Tenant; (g) the date to which rent has been paid; (h) the amount of security deposited with Landlord; and (i) such other information as Landlord (or its mortgagees or potential purchasers of the Premises) may reasonably request. In the event Tenant fails within five (5) business days after Landlord has delivered to Tenant an Estoppel Certificate pursuant to this subsection to properly execute and deliver the same to Landlord, Tenant shall be deemed to have consented to such Estoppel Certificate as written. Landlord's mortgage lenders and/or purchasers shall be entitled to rely upon such declaration.

**6.5** **Notice to Mortgagee**. In the event of any act or omission by Landlord which would give Tenant the right to damages or to terminate this Lease, Tenant shall not commence action or terminate this Lease until it shall have given written notice to Landlord and the holder of the indebtedness or other obligation secured by a first mortgage or first deed of trust affecting the Premises, provided the name and address of such holder has previously been furnished to Tenant, and until a reasonable period of time for remedying such act or omission shall have elapsed following the giving of such notice, during which time Landlord and such holder, or either of them, their agents or employees, shall be entitled to enter the Premises and do whatever may be necessary to remedy such act or omission. Tenant shall have the right to obtain from Landlord the name and address of the holder of any mortgage lien upon the Premises and may rely upon information so obtained.

**6.6** **Sale by Landlord**. A sale, conveyance or assignment of the Building shall operate to release Landlord from liability from and after the effective date thereof upon all the covenants, terms, and conditions of this Lease, express or implied, except as such may relate to the period prior to such effective date and Tenant shall thereafter look solely to Landlord's successor in interest in and to this Lease. This Lease shall not be affected by any such sale, conveyance or assignment, and Tenant shall attorn to Landlord's successor in interest thereunder and the provisions of this Lease shall be binding upon any successor or assign of Landlord.

## 7 MAINTENANCE, ALTERATIONS, REPAIRS

**7.1** **Maintenance by Landlord**. Landlord shall repair, replace and maintain the external and structural parts of the Building of which the Premises are a part, but which do not comprise a part of the Premises and are not leased to others, janitor and equipment closets, parking structures and elevators, stairwells and other areas within the Building of which the Premises are a part which are designated by Landlord for use in common with all Tenants or are used in connection with the operation and maintenance of said Building. Landlord shall perform such repairs, replacements and maintenance with reasonable dispatch, in good and workmanlike manner, but Landlord shall not be liable for any damages, direct, indirect or consequential, or for damages for personal discomfort, illness or inconvenience of Tenant by reason of failure of such equipment, facilities or systems or reasonable delays in the performance of such repairs, replacements and maintenance, unless caused by the deliberate act or omission or negligence of Landlord, its servants, agents or employees.

**7.2** **Maintenance Repairs by Tenant**. Landlord shall not be required to make any alterations, improvements, or additions in or about the Premises.~~ unless, and only to the extent, specifically listed on an exhibit attached to this Lease executed by the parties hereto.~~ Tenant shall maintain the Premises and any alterations and additions to the Premises in good condition. Tenant shall repair or replace any damage or injury to the Premises caused by Tenant, its agents, employees, or invitees. All maintenance and repairs made by Tenant shall be performed only by licensed contractors first approved by Landlord. Tenant shall require its contractor to comply with Landlord's regulations regarding all work to be performed. If, within ten (10) days following occurrence, Tenant fails to repair or replace any damage to the Premises caused by Tenant, its agents, employees or invitees, Landlord may, at its option, cause all required maintenance, repairs, or replacements to be made. Tenant shall promptly pay Landlord all costs incurred plus an administrative fee of fifteen percent (15%) of such costs.

**7.3** **Alterations**. Tenant shall not make any alterations, improvements, additions, or utility installations, excluding telephone services, in or about the Premises without the prior approval of Landlord in writing. Landlord shall have the right to withhold its consent. Any such request from Tenant shall specifically state whether Tenant

shall be obligated to remove said alterations or improvements upon expiration of the term of the Lease. If consented to by Landlord, these alterations, improvements, additions, or utility installations shall be performed at the sole cost and expense of Tenant in compliance with all applicable statutes, ordinances, and regulations. Upon expiration of the term of the Lease, such alterations or improvements shall either remain therein or be removed by Tenant based upon the conditions set forth in the approval given prior to installation, unless Landlord shall otherwise agree. If Tenant is obligated to remove same, then such alterations or improvements shall be promptly removed by Tenant and the Leased Premises replaced in substantially the condition existing prior to the making of said alterations or improvements. In making alterations, improvements, and additions to the Premises or in maintaining the Premises, Tenant shall not permit any lien or encumbrance to be made or filed thereon; and, in the event such lien is filed, Tenant shall promptly secure the release and discharge thereof by recorded instrument.

**7.4** **Trade Fixtures**. Trade fixtures, equipment, or other personal property which are installed in the Premises by Tenant and are not affixed to the walls, ceiling, floors, or other part thereof shall remain the property of Tenant and, providing that Tenant is not in default in performance of this Lease, they may be removed by Tenant at any time during the term of the Lease.

**7.5** **Landlord's Right of Entry**. Landlord, its agents, or employees shall have the right to enter the Premises at reasonable hours to make inspections, alterations, or repairs to the Premises. In event of emergency, Landlord, its agents, or employees shall have the right of entry at any time and may perform any acts related to safety, protection, preservation, or improvements of the Premises. Except for repair of casualty damage, Tenant shall not be entitled to any abatement or reduction of rent because of work performed within the Premises by Landlord.

**8 USE OF PREMISES**

**8.1** **Use by Tenant**. The Premises shall be used only for the use specified in the Basic Lease Provisions and for no other use. Tenant shall, at Tenant's expense, comply with all laws, rules, regulations, requirements, and ordinances enacted or imposed by any governmental unit having jurisdiction over the Premises, Landlord or Tenant.

**8.2** **Restrictions on Use**. Tenant shall not:

- **a)** Do, or permit to be done, anything which will invalidate or increase the cost of any insurance coverage on the Premises.
- **b)** Do, or permit anything to be done, on the Premises which will obstruct or interfere with the rights of other tenants or occupants of the Premises.
- **c)** Use, allow, or permit the Premises to be used for any improper or objectionable purposes.
- **d)** Cause, maintain, or permit any nuisance in or about the Premises.
- **e)** Commit or permit any waste to be committed in the Premises.
- **f)** Use or occupy the Premises in violation of any law, rule, regulation, requirement, or ordinance enacted or imposed by any governmental unit having jurisdiction over the Premises, Landlord or Tenant.
- **g)** Overload, damage, or obstruct any utility lines providing services to the Premises.
- **h)** Install any fixtures or equipment which will overload the floors in the Premises or in any way affect the structural capacity or design of the Premises or the Building.
- **i)** Install, remove from, or move into the Premises any furniture, fixtures, or equipment except on a day and at a time acceptable to Landlord.

**8.3** **Quiet Enjoyment.** Landlord agrees that, subject to the terms, covenants and conditions of this Lease, Tenant may, upon observing and complying with all terms, covenants, and conditions of this Lease, peaceably and

quietly occupy the Premises.

**8.4** **Parking**. Tenant shall be assigned two (2) parking stalls in the secured parking structure of the Building, with the option of renting one (1) additional stall. The value of the additional stall will be evaluated and added to the monthly rent as needed. The parking areas, or designated portions thereof, shall be available, at large, for the use of the tenants of the Project and, to the extent designated by Landlord, the employees, agents, customers, and invitees of said tenants and Landlord, subject to all rules, regulations, charges, and rates as from time-to-time may be set forth by Landlord. Landlord may, however, restrict to certain portions of the parking areas parking for all tenants of the Project and their employees or agents, and may designate other areas to be used, at-large, only by customers and invitees of the tenants of the Project and Landlord. Notwithstanding anything elsewhere herein contained, Landlord reserves the right from time-to-time to make such changes in, additions to, or deletions from the parking areas and the purposes to which the same may be devoted, and the use of the parking areas shall always be subject to such reasonable rules and regulations as may be promulgated by Landlord. Landlord, or its agents, shall have the right to cause to be removed any cars of Tenant, its employees or agents, that are parked in violation thereof or in violation of Building Regulations, without liability of any kind to Landlord, its agents or employees, and Tenant agrees to hold Landlord harmless from and indemnify and defend it against any and all claims, losses, or damages and demands asserted or arising in respect to or in connection with the removal of any such automobiles as aforesaid. Tenant shall from time-to-time, upon request of Landlord, supply Landlord with a list of license plate numbers of all automobiles owned by its employees and agents who are to have parking privileges hereunder. Landlord may, as part of the parking area regulations, require that Tenant cause an identification sticker issued by Landlord, to be affixed to the bumpers or other designated location of all automobiles of Tenant, its employees and agents who are authorized to park in the parking areas.

**8.5** **Signs**. Tenant shall not display, inscribe, paint, or affix any sign, picture, advertisement or notice visible from anywhere outside the Premises without Landlord's prior written consent. If consented to by Landlord any such sign shall be painted by a sign painter approved by Landlord and shall be maintained by Tenant during Tenant's occupancy of the Premises. All costs for production, installation, maintenance, and removal shall be Tenant's responsibility. All such approved signs shall be removed by Tenant upon vacating the Premises and any damage caused by such removal shall be immediately repaired.

**8.6** **Windows**. Tenant shall not place or allow anything to be placed near the glass of any window, door, partition, or wall, which may appear unsightly from outside the Premises. Landlord shall furnish and install a Building standard window covering at all exterior windows. Tenant shall not, without prior written consent of Landlord, sunscreen any window.

## 9 INSURANCE, INDEMNITY, SUBROGATION

**9.1** **Insurance by Tenant**. Tenant shall during the term of this Lease and at Tenant's cost, obtain and keep in effect, insuring Tenant, Landlord, and all mortgagees of the Premises (as their interests may appear), the following insurance:

- **a)** Insurance upon all property situated in the Premises owned by Tenant or for which Tenant is legally liable and on fixtures and improvements installed in the Premises by or on behalf of Tenant. Such policies shall be for an amount of not less than 90% of the full replacement cost with coverage against at least fire with standard extended coverage, sprinkler leakage and water damage. If there is a dispute as to the replacement cost amount, the decisions of Landlord shall be conclusive. It is understood Landlord provides no insurance upon the personal property of Tenant.
- **b)** Public liability and property damage insurance including personal injury and contractual liability and owners and contractor s protective insurance coverage with respect to the Premises. The coverage is to include activities and operations conducted by Tenant and any other person in the Premises and Tenant and any other person performing work on behalf of Tenant and those for whom Tenant is in law responsible in any other part of the Premises. Such insurance shall be written on a comprehensive basis with inclusive limits of not less than One Million Dollars ($1,000,000.00) for

each occurrence for bodily injury and a like amount for property damage or such higher limits as Landlord, acting reasonably, may require from time to time. The policies shall provide that the interests of Landlord and its mortgagee shall not be invalidated because of any breach or violation of any warranties, representations, declarations, or conditions contained in the policies. The policies shall be primary and shall not call into contribution any other insurance available to Landlord or its mortgagee and shall name Landlord as additional insured; and

**c)** Any other form of insurance, as Tenant, Landlord, or its mortgagee, acting reasonably, requires from time to time. Such insurance shall be in the form, amounts and for the risks which a prudent Tenant would insure.

**9.2** **Insurance Policies**. The minimum limits of policies shall in no event limit the liability of Tenant hereunder. The aforesaid insurance shall name Landlord as an additional insured. Said insurance shall be with companies having a rating of not less than "A" in "Best's Insurance Guide." Tenant shall furnish from the insurance companies or cause the insurance companies to furnish to Landlord certificates of coverage. No such policy shall be cancellable except after thirty (30) days' prior written notice to Landlord by insurer. All such policies shall be as written primary policies, not contributing with and not more than the coverage which Landlord may carry. Tenant shall, at least twenty (20) days prior to the expiration of such policies, furnish Landlord with renewals or binders. Tenant agrees that if Tenant does not take out and maintain such insurance, Landlord may (but shall not be required to) procure said insurance on Tenant's behalf and charge Tenant the premiums together with an administrative charge in the amount of One Hundred Dollars ($100.00) which the parties agree shall be paid to Landlord to compensate Landlord for the additional administrative expense incurred by Landlord and not as a commission or fee paid for procuring insurance, payable upon demand. Tenant shall have the right to provide such insurance coverage pursuant to blanket policies obtained by Tenant, provided such blanket policies expressly afford coverage to the Premises and to Tenant as required by this Lease.

**9.3** **Subrogation**. Tenant waives its right of subrogation against Landlord for any reason whatsoever, and any insurance policies herein required to be procured by Tenant shall contain an express waiver of any right of subrogation by the insurer against Landlord.

**9.4** **Lender**. Any mortgage lender interested in any part of the Property, Building or Improvements may, at Landlord's option, be afforded coverage under any policy required to be secured by Tenant hereunder, by use of a mortgagee's endorsement to the policy concerned.

**9.5** **Insurance Compliance.** No use shall be made or permitted to be made on the Premises, nor acts done, which will increase the existing rate of insurance upon the Building or cause the cancellation of any insurance policy covering the Building, or any part thereof, about the Premises, any article which may be prohibited by the Standard Form of Fire Insurance Policies. Tenant shall, at its sole cost and expense, comply with all requirements pertaining to the Premises, of any insurance organization or company, necessary for the maintenance of reasonable fire and public liability insurance covering the Premises, Building, and the Project.

**10 DAMAGE; DESTRUCTION; CONDEMNATION**

**10.1** **Damage and Destruction.** In the event the Building or the Premises shall be destroyed or rendered untenantable, either in whole or in part, by fire or other casualty, Landlord may, at its option, restore the Building or Premises to as near their previous condition as is reasonably possible. During such period, the rent shall be abated in the same proportion as the untenantable portion of the Premises bears to the whole thereof. Unless Landlord, within sixty(60) days after the happening of any such casualty, shall notify Tenant of its election to so restore, this Lease shall thereupon terminate, and Tenant shall vacate the Premises. If such restoration is not completed to allow a restitution of business use by Tenant within one hundred twenty (120) days of commencement of such repair, Tenant shall have the right to terminate this Lease. Such restoration by Landlord shall not include replacement of furniture, equipment or other items that do not become part of the Building or any improvements to the Premises more than those provided for in the allowance for building standard items as of the Commencement Date. Restoration of the Premises required

beyond Landlord's obligation shall be performed by Tenant at no cost to Landlord.

**10.2** **Delay Beyond Landlord's Control**. No penalty shall accrue to Landlord for delay in commencing or completing repairs caused by adjustment of insurance claims, governmental requirements, or any cause beyond Landlord's reasonable control.

**10.3** **Condemnation; Award; Termination.** If the Building or Premises shall be taken or condemned for any public purpose, or for any reason whatsoever, to such an extent as to render either or both untenantable, either Landlord or Tenant shall have the option to terminate this Lease effective as of the date of taking or condemnation. If the taking or condemnation does not render the Building and the Premises untenantable, this Lease shall continue in effect and Landlord shall promptly restore the portion not taken to the extent possible to the condition existing prior to the taking. If, because of such restoration, the area of the Premises is reduced, the rental shall be reduced proportionately. All proceeds from any taking or condemnation shall be paid to Landlord. Tenant waives all claim against such proceeds. A voluntary sale or conveyance in lieu of, but under the threat of condemnation, shall be considered a taking or condemnation for public purpose.

## 11 SURRENDER OF PREMISES

**11.1** **Surrender at Expiration.** Upon termination of this Lease, whether caused by lapse of time or otherwise, Tenant shall at once surrender possession of the Premises and deliver Premises to Landlord in as good repair and condition as at the commencement of Tenant's occupancy, reasonable wear and tear and damage or destruction by fire or other casualty excepted. Tenant shall deliver all keys to the Premises to Landlord. If possession is not immediately surrendered, Landlord may take possession of the Premises and expel or remove Tenant and any other person occupying all or a portion of the Premises, by force if necessary, without having any civil or criminal liability.

**11.2** **Title to Improvements.** All alterations, additions, or improvements, whether temporary or permanent, made in or upon the Premises either by Landlord or Tenant, shall be Landlord's property on termination and shall remain on the Premises without compensation to Tenant.

**11.3** **Removal of Furniture; Trade Fixtures; Abandonment.** All furniture, movable trade fixtures and equipment installed by Tenant may be removed by Tenant at or prior to termination of the Lease. All such removals shall be accomplished in a workmanlike manner so as not to damage the Premises, the structure or structural qualities of the Building or the plumbing, electrical lines, or other utilities. All furniture, movable trade fixtures and equipment installed by Tenant not promptly removed by Tenant shall be presumed to have been abandoned and Landlord may, at its option, take possession of such property and either declare it to be the property of Landlord by furnishing Tenant written notice or, at Tenant's cost remove such property in any manner Landlord chooses and store it without incurring liability to Tenant or any other person.

## 12 DEFAULT; REMEDIES

**12.1** **Events of Default by Tenant.** The occurrence of any one of the following events shall constitute a default of this Lease by Tenant:

- **a)** Failure of Tenant to make any payment of rent or other required payment, when due, and such failure continues for a period of ten (10) calendar days after the same is due and payable.
- **b)** Vacating or abandonment of all or a substantial portion of the Premises.
- **c)** Failure of Tenant to comply with any provision of this Lease, other than payment of rent, and such failure shall continue for fifteen (15) business days after mailing of written notice by Landlord to Tenant; provided however, that if the nature of Tenant's default is such that more than fifteen (15) business days are reasonably required for its cure, Tenant shall not be in default if Tenant commences such cure and diligently prosecutes such cure to completion.
- **d)** The making of an assignment for the benefit of creditors by Tenant or guarantors of Tenant's obligations.

**e)** The filing by Tenant or a guarantor of Tenant's obligations of a petition under any section or chapter of the present Federal Bankruptcy Act or amendment thereto or under any similar law or statute of the United States or any state thereof, or the adjudication of Tenant or guarantor of Tenant's obligations as a bankrupt or insolvent in proceedings filed against Tenant or guarantor, and such adjudication shall not have been vacated, set aside, or stayed within the time permitted by law.

**f)** The appointment of a receiver or trustee for all or substantially all the assets of Tenant or any guarantor of Tenant's obligations and such receivership shall not have been terminated or stayed within the time permitted by law.

**g)** The attachment, execution, or other judicial seizure of substantially all of Tenant's assets located in the Premises or of Tenant's interest in this Lease where such seizure is not discharged within thirty
(30) days.

**12.2** **Remedies in Event of Default by Tenant.** Upon the occurrence of any event of default, Landlord shall have the option to do any one or more of the following without any notice or demand, in addition to and not in limitation of any other remedy permitted by law or this Lease:

**a)** Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord. If Tenant shall fail to do so, Landlord may without notice and prejudice to any other remedy available, enter and take possession of the Premises and remove, Tenant or anyone occupying the Premises and its effects without being liable to prosecution or any claim for damages. Tenant agrees to indemnify Landlord for all loss and damage suffered by Landlord because of such termination whether through inability to re-let the Premises or otherwise, including any loss of rent for the remainder of the term of this Lease.

**b)** Declare the entire amount of all rent which would have become due and payable during the remainder of the term of this Lease to be due and payable immediately, in which event Tenant agrees to pay the same to Landlord immediately. Such payment shall constitute payment in advance of the rent stipulated for the remainder of the lease term. Acceptance by Landlord of the payment of such rent shall not constitute a waiver of any than existing default thereafter occurring.

**c)** Enter upon and take possession of the Premises as agent of Tenant without terminating this Lease and without being liable to prosecution or any claim for damages. Landlord may re-let all or any portion of the Premises as the agent of Tenant for such term and upon such terms as Landlord sees fit and receive the rent, in which event Tenant shall pay to Landlord on demand the cost of renovating, repairing and altering the Premises for a new tenant or tenants, plus all costs of reletting the Premises and any deficiency arising by reason of such reletting; provided, however, that Landlord shall have no duty to re-let the Premises and Landlord's failure to do so shall not release Tenant's liability for rent, or damages. If Landlord elects to enter and re-let the Premises Landlord may at any time thereafter elect to terminate this Lease for Tenant's default. If Landlord takes possession of the Premises, Landlord shall have the right to rent any other available space in the Building before reletting or attempting to re-let the Premises.

**12.3** **Events of Default by Landlord.** Landlord covenants with Tenant that if Landlord shall violate or neglect any covenant, agreement or stipulation herein contained on its part to be kept, performed or reserved and any such default shall continue without diligent effort to remedy same for thirty (30) days after written notice thereof is given by Tenant to Landlord and to the holder of any mortgage on any part of the real property on which the Premises are located, then, in addition to the other remedies or causes of action now or hereafter provided by law, Tenant may, at its option, cure such default and Landlord shall reimburse Tenant's reasonable costs incurred in carrying such default within thirty (30) days after demand thereof by Tenant, which demand shall be accompanied by a statement or statements showing such costs. In the event Landlord fails or refuses to reimburse Tenant within thirty (30) days after Tenant's written demand for such reimbursement, Tenant may sue Landlord therefor or Tenant may terminate this Lease. It is provided, however, that if at the time of the expiration of such thirty (30) day period, Landlord is engaged in good faith to

remedy such default and continues so to do, or if, prior to the expiration of such thirty (30) day period, Landlord shall give to Tenant adequate security to remedy such default, then this Lease and Landlord's rights hereunder shall continue in full force and effect. Any amounts due to Tenant in accordance with the provisions of this section which shall remain unreimbursed thirty (30) days after the date of such demand, shall bear interest at the prime of interest of Wells Fargo Bank, N.A. per annum.

**13 MISCELLANEOUS PROVISIONS**

**13.1** **Assignment.** Tenant agrees that Tenant will not assign this Lease or sublet the whole or any part of the Premises without the written consent of Landlord, not to conduct any business upon any said Premises other than when presently being conducted by tenants on adjoining property, without the written consent of Landlord being first obtained; Landlord agrees not to unreasonably withhold its consent.

**13.2** **Waiver.** No provisions of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing signed by Landlord. Landlord's waiver of a breach of any term or condition of this Lease shall not prevent a subsequent act, which would have originally constituted a breach, from having the effect of any original breach. Landlord's receipt of rent with knowledge of a breach by Tenant of any term or condition of this Lease shall not be deemed a waiver of such breach. Landlord's failure to enforce against Tenant or any other tenant of the Building any of the rules or regulations made by Landlord shall not be deemed a waiver of such rules or regulations. No act or thing done by Landlord, its agents or employees during the lease term shall be deemed an acceptance of a surrender of the Premises and no agreement to accept a surrender of the Premises shall be valid unless in writing signed by Landlord. The delivery of keys to any of Landlord's agents or employees shall not operate as a termination of this Lease or a surrender of the Premises. No payment by Tenant, or receipt by Landlord, of a lesser amount than the rent due shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying or payment as rent be deemed an accord and satisfaction and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy available to Landlord.

**13.3** **Holding Over**. If Tenant shall continue to occupy the Premises after expiration or sooner termination of this Lease, Tenant shall pay, as liquidated damages, for each month of continued occupancy an amount equal to one and one-half times the rent being paid for the month the Lease expires or is terminated. No receipt of money by Landlord from Tenant after expiration or termination of this Lease shall reinstate or extend this Lease or affect any prior notice given by Landlord to Tenant.

**13.4** **Indemnification by Tenant.** This Lease is made on the express condition that Landlord shall not be liable or suffer loss by reason of injury or death to person or property, from whatever cause, all or in any way connected with the condition or use of the Premises, or the improvements or property therein or thereon, or the acts or omissions of Tenant, its employees, agents, invitees or licensees, including without limitation any liability for injury or death to the person or property of Tenant, its agents, officers, employees, invitees, or licensees. Tenant agrees to indemnify Landlord and hold it harmless from all liability, loss, cost, or obligation, including investigation and defense costs, on account of, or arising out of, any such injury, death, or loss, however occurring, unless due to negligence on the part of Landlord. In case any action, suit, or proceeding is brought against Landlord by reason of any such occurrence, Tenant, upon Landlord's request, will at Tenant's expense resist and defend such action, suit, or proceeding, or cause the same to be resisted and defended by counsel designated by Tenant and approved by Landlord. The obligations of Tenant under this section arising by reason of any occurrence taking place during the Lease Term shall survive any termination of this Lease.

**13.5** **Removal of Property.** If Tenant shall fail to remove any of its property of any nature from the Premises or Building at the termination of this Lease or when Landlord has the right of re-entry, Landlord may, at its option immediately remove and store said property without liability for loss or damage, such storage to be for the account and at the expense of Tenant. In the event that Tenant shall not pay the cost of storing any such property after it has been stored for a period of thirty (30) days or more, Landlord may, at its option, sell, or

permit to be sold, any or all of such property at public or private sale, in such manner and at such times and places as Landlord in its sole discretion may deem proper, without notice to Tenant, and shall apply the proceeds of such sale, first to the cost and expense of such sale, including reasonable attorne s fees actually incurred; second to the payment of the cost for storing such property; third to the payment of any other money which may then be or thereafter become due Landlord from Tenant under any of the terms of this Lease; and fourth, the balance, if any, to Tenant.

**13.6** **Notices.** Any notice from one party to the other shall be in writing and shall be deemed duly served if delivered personally to a responsible employee of the party being served or if mailed by prepaid registered or certified mail addressed to Tenant or to Landlord at the address set forth in Basic Lease Provisions for such party. Any notice shall be deemed to have been given at the time of personal delivery or, if mailed, three days after the date of mailing. Either party shall have the right to designate, by notice in the manner set forth above, a different address to which notices are to be mailed.

**13.7** **Attorney s Fees.** If at any time during the term of this Lease or thereafter, either Landlord or Tenant shall institute any action or proceeding against the other relating to the provisions of this Lease, on any default hereunder, then, and in that event, the unsuccessful party in such action or proceeding agrees to reimburse the successful party for the reasonable expense of attorne s fees and disbursements incurred therein by the successful party.

**13.8** **Successors.** Except as otherwise specifically provided, the terms, covenants and conditions contained in this Lease shall apply to and bind the heirs, successors, executors, administrators and assigns of the parties to this Lease.

**13.9** **Joint and Several Liability.** If there is more than one Tenant, the obligations imposed by this Lease upon Tenant shall be joint and several. If there is a guarantor of Tenant's obligations, the obligations imposed on Tenant shall be joint and several obligations of Tenant and guarantor. Landlord need not first proceed against Tenant before proceeding against guarantor. The guarantor shall not be released from its guaranty for any reason whatsoever including amendments to the Lease, waivers of default of Tenant, failure to give guarantor any notices to be given Tenant or release of any party liable for payment of Tenant's obligations under this Lease.

**13.10** **Merger**. The voluntary or other surrender of this Lease by Tenant or the cancellation of this Lease by mutual agreement of Landlord and Tenant shall not work a merger and shall, at Landlord's option, terminate all or any subleases or sub tenancies. Landlord's option shall be exercised by notice to Tenant and all known tenants under any sublease or sub tenancy.

**13.11** **Relationship of Parties.** Nothing contained in this Lease shall create any relationship between Landlord and Tenant other than that of Landlord and Tenant, and it is acknowledged and agreed that Landlord does not in any way or for any purpose become a partner of Tenant in the conduct of Tenant's business, or a joint venture or a member of a joint or common enterprise with Tenant.

**13.12** **Entire Agreement; Captions.** Tenant acknowledges and agrees that it has not relied upon any statement, representation, agreement, or warranty except such as may be expressly set forth in this Lease and it is agreed by Landlord and Tenant that no amendment or modification of this Lease shall be valid or binding unless in writing executed by Landlord and Tenant. No provision of this Lease shall be altered, waived, amended, or extended except in writing executed by Landlord and Tenant. The paragraph headings contained in this Lease are for convenience only and shall in no way enlarge or limit the scope or meaning of the provisions of this Lease.

**13.13** **Severability.** Each covenant and agreement continued in this Lease is, and shall be construed to be, a separate and independent covenant and agreement. If any term or provision of this Lease or the application thereof to any person or circumstances shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected.

**13.14 Gender.** Words of any gender used in this Lease shall be held and construed to include any other gender and words in the singular number shall be held to include the plural, unless the context otherwise requires.

**13.15 Brokerage Commissions.** Tenant warrants that it has had no dealings with any broker or agent in connection with the negotiation or execution of this Lease, and Tenant agrees to indemnify Landlord and hold Landlord harmless from and against all costs, expenses or liabilities for commissions or other compensation or charges claimed by or awarded to any broker or agent with respect to this Lease.

**14 BUYOUT OF LEASE**

**14.1 Termination of Lease.** Notwithstanding any other provision of this Lease, Landlord shall have the right to terminate this Lease for any reason, including by way of example and not by way of limitation, failure of Landlord to obtain sufficient tenants or to otherwise profitably operate the Building; requirements of any mortgagee of Landlord; or election by Landlord to not comply with or incur costs required to be expended by governmental agencies or others to bring the Project into compliance with zoning, safety, construction, environmental or other requirements. Landlord's right to terminate must be exercised strictly in accordance with the provisions of this Section 16. The right herein granted to Landlord shall be exercised in the sole and absolute discretion of Landlord.

**14.2 Exercise and Notice.** Landlord's right to terminate this Lease may be exercised only within the period which shall be between the date which shall be the first day of the eighteenth (18th) month following the Commencement Date and the first day of the twenty-fourth (24th) month following the Commencement Date. If Landlord shall elect to exercise such right of termination, Landlord shall be required to give Tenant written notice of such termination and such notice shall be delivered by personal service to Tenant in the manner provided for personal service under the laws of the State of Texas.

**14.3 Effective Date of Termination.** This Lease shall be deemed to be terminated on the date which shall be six (6) months after the date of personal service of the notice required under Section 16.2.

**14.4 Payment to Tenant.** As an express condition of the exercise of Landlord's right to terminate this Lease, Landlord shall be required to pay to Tenant an amount equal to six (6) times the Initial Basic Monthly Rent set forth in the Basic Lease Provisions. Said amount shall be due and payable by Landlord upon Tenant surrendering the Premises to Landlord.

IN WITNESS WHEREOF, the parties hereto and hereunder have set their hands at Brazoria, Texas, the day, and year first above written.

LANDLORD: Michel Neret MD Medical Clinic,

a Texas professional corporation

DocuSigned by:

By____________________

DF57C4876FB0486...

Name: Michel Neret MD

Its:

TENANT: GeneralHealthGroup Inc.,

a Florida Corporation

DocuSigned by:

By Ruth Berenstein

BB9EE191224C430...

Name: Ruth Berenstein

Its: